**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**

| | |
|---|---|
| DONALD B. HODGES, JOYCE R. KENDRICK, Individually and on behalf of the Washington Regional 401(k) Plan, and on behalf of all the similarly situated participants and beneficiaries of the plan, <br><br> Plaintiffs, <br><br> v. <br><br> WASHINGTON REGIONAL MEDICAL SYSTEM and the PENSION COMMITTEE, <br><br><br> Defendants. | Case No. 5:26-cv-05070-TLB |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION**
**TO DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 3

LEGAL STANDARDS ................................................................................................... 5

ARGUMENT .................................................................................................................. 6

   I. The Complaint pleads a meaningful benchmark: four named, investable, market-leading peer suites across thirteen accepted metrics, vintage by vintage. ............................................ 6

      A.   The four named, market-leading suites provide a sound basis for comparison because they share the AC TDFs' market, category, and MPT constraints. ................................. 7

      B.   Risk-adjusted metrics neutralize the "conservative strategy" argument by measuring return per unit of risk actually borne. .............................................................................. 15

      C.   The extrinsic Morningstar appendices cannot defeat comparability on the pleadings, and on their own numbers they reinforce the Complaint. ............................................. 18

         1.   The Court should not consider the extrinsic appendices, which postdate the pleaded data and are offered to contradict it. ............................................................... 19

         2.   Even if considered, the appendices go to the weight of the comparison, not to whether a meaningful benchmark has been pleaded. ............................................................. 21

         3.   Even on their own terms, the appendices engage only raw return—two of the thirteen metrics—and stay silent on the eleven risk-adjusted and efficiency measures on which the AC TDFs trailed. ......................................................................................... 22

   II. The Complaint pleads imprudence, not mere underperformance, through circumstantial facts from which a flawed monitoring process may be inferred. ......................................... 24

   III. The Eighth Circuit has adopted no magnitude or duration floor, and the pleaded grid states a claim that runs into the Class Period. .................................................................. 26

      A.   No binding authority sets a magnitude floor, and the shortfall is consistent across metrics, not a single spread. ................................................................................... 27

      B.   Repeated underperformance over three- and five-year periods is sufficient; no ten-year minimum applies. .................................................................................................. 31

   IV. Count II survives because Count I survives, and the Company's appointment-and-monitoring duties are independently pleaded. .................................................................. 33

i

CONCLUSION .............................................................................................................. 34

## TABLE OF AUTHORITIES

**Cases**                                                                                              **Page(s)**

*Abel v. CMFG Life Ins. Co.*,
  2024 WL 307489 (W.D. Wis. Jan. 26, 2024) ...................................................................11, 31

*Anderson v. Intel Corp. Inv. Pol'y Comm.*,
  137 F.4th 1015 (9th Cir. 2025) ......................................................................................... 15

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ........................................................................................................... 5

*Baird v. BlackRock Inst. Tr. Co.*,
  403 F. Supp. 3d 765 (N.D. Cal. 2019) .............................................................................. 21

*Batt v 3M Co.*,
  25-CV-3149 (ECT/DTS), 2026 WL 674322 (D. Minn. Mar. 10, 2026) ............................ 30, 33

*Beldock v. Microsoft Corp.*,
  No. 2:22-cv-01082, 2023 WL 3058016 & n.7 (W.D. Wash. Apr. 24, 2023) ............................ 17

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ........................................................................................................... 5

*Binder v. PPL Corp.*,
  2024 WL 1096819 (E.D. Pa. Mar. 12, 2024) ....................................................................... 32

*Braden v. Wal-Mart Stores, Inc.*,
  588 F.3d 585 (8th Cir. 2009) ................................................................................ 5, 24, 25, 29

*Carter v. Sentara Healthcare Fid. Comm.*,
  2025 WL 2427614 (E.D. Va. Aug. 11, 2025) .............................................................. 12, 27, 28

*Davis v. Wash. Univ. in St. Louis*,
  960 F.3d 478 (8th Cir. 2020) ..................................................................................... passim

*Dawson v Brookfield Asset Mgt. LLC*,
   1:25-CV-00852-PAB, 2026 WL 835553 (N.D. Ohio Mar. 26, 2026) .................... 14, 17, 29, 30

*DiFelice v. U.S. Airways, Inc.*,
  497 F.3d 410 (4th Cir. 2007) ............................................................................................. 15

*Doll v. Evergy, Inc.*,
  2025 WL 4042583 (W.D. Mo. Sept. 10, 2025) ............................................................ passim

*Fezer v. Lockheed Martin Corp.*,
   2026 WL 1041276 (D. Md. Apr. 16, 2026)........................................................................ 21, 28

*Fifth Third Bancorp v. Dudenhoeffer*,
   573 U.S. 409 (2014)......................................................................................................... 1

*Fitzpatrick v. Neb. Methodist Health Sys., Inc.*,
   2023 WL 5105362 (D. Neb. Aug. 9, 2023)........................................................................ 10

*Fulton v. FCA US LLC*,
   No. 24-CV-13159, 2025 WL 2800003 (E.D. Mich. Sept. 30, 2025) ........................................ 32

*Hall v. Cap. One Fin. Corp.*,
   No. 1:22-cv-00857, 2023 WL 2333304 & n.6 (E.D. Va. Mar. 1, 2023) .................................. 17

*Hughes v. Nw. Univ.*,
   595 U.S. 170 (2022)................................................................................................... passim

*Johnson v. Parker-Hannifin Corp.*,
   122 F.4th 205 (6th Cir. 2024).......................................................................................... 32

*Jones v. DISH Network Corp.*,
   No. 22-CV-00167-CMA-STV, 2023 WL 2644081 (D. Colo. Mar. 27, 2023) .......................... 31

*Kistler v. Stanley Black & Decker, Inc.*,
   No. 3:22-cv-966, 2024 WL 3292543 (D. Conn. July 3, 2024) .................................... 16, 17, 29

*Luckett v Wintrust Fin. Corp.*,
   2024 WL 3823175 (N.D. Ill. Aug. 14, 2024)........................................................................ 12

*Matousek v. MidAmerican Energy Co.*,
   51 F.4th 274 (8th Cir. 2022)................................................................................ 6, 10, 20, 29

*McGeathy v. Reinalt-Thomas Corp.*,
   No. CV-25-01439-PHX-DLR, 2026 WL 617343 (D. Ariz. Mar. 5, 2026) ........................ passim

*Meiners v. WellsFargo & Co.*,
   898 F.3d 820 (8th Cir. 2018)............................................................................................ 10

*N. Oil & Gas, Inc. v. EOG Res., Inc.*,
   970 F.3d 889 (8th Cir. 2020)............................................................................................ 21

*Nolan v. Sonic Automotive, Inc.*,
   No. 3:25-CV-00474-KDB-WCM, 2026 WL 1195596 (W.D.N.C. May 1, 2026).............. 27, 30

*Patterson v. Morgan Stanley*,
  2019 WL 4934834 (S.D.N.Y., 2019) ................................................................... 31

*Payne v. Hormel Foods Corp.*,
  No. 24-CV-545 (SRN/DTS), 2024 WL 4228613 (D. Minn. Sept. 18, 2024) ..................... 28, 31

*Pfeil v. State Street Bank & Tr. Co.*,
  806 F.3d 377 (6th Cir. 2015) ............................................................................. 16

*Phillips v. Cobham Advanced Elec. Sols., Inc.*,
  No. 23-CV-03785-EKL, 2025 WL 2689268 (N.D. Cal. Sept. 19, 2025) ................ 13, 14, 17, 21

*Porous Media Corp. v. Pall Corp.*,
  186 F.3d 1077 (8th Cir. 1999) ........................................................................ 19, 20

*Riley v. Olin Corp.*,
  2023 WL 371872 (E.D. Mo. Jan. 24, 2023) ............................................................. 10

*Ruebel v Tyson Foods, Inc.*,
  5:23-CV-5216, 2024 WL 3682230 (W.D. Ark. Aug. 6, 2024) .......................................... 20

*Sellers v. Trs. of Boston Coll.*,
  647 F. Supp. 3d 14 (D. Mass. 2022) ..................................................................... 32

*Smith v. CommonSpirit Health*,
  37 F.4th 1160 (6th Cir. 2022) ....................................................................11, 29, 32

*Snyder v. UnitedHealth Group*,
  2021 WL 5745852 (D. Minn. Dec. 2, 2021) ........................................................... 9, 23

*Thomson v. Caesars Holdings Inc.*,
  661 F. Supp. 3d 1043 (D. Nev. 2023) .................................................................... 32

*Tibble v. Edison Int'l*,
  575 U.S. 523 (2015) .............................................................................. 6, 26, 34

*Trauernicht v. Genworth Fin. Inc.*,
  2023 WL 5961651 (E.D. Va. Sept. 13, 2023) ......................................................... 7, 32

*Usenko v. MEMC LLC*,
  926 F.3d 468 (8th Cir. 2019) ............................................................................ 23

*Wildman v. Am. Century Servs., LLC*,
  362 F. Supp. 3d 685 (W.D. Mo. 2019) ................................................................... 33

**<u>Rules</u>**

Fed. R. Civ. P. 12(b)(6) ........................................................................................................ 20

Fed. R. Civ. P. 12(d) ........................................................................................................ 19, 21

**<u>Regulations</u>**

29 C.F.R. § 2550.404a-1(b)(2)(i) ........................................................................................ 15

## INTRODUCTION

Rather than engage the Complaint they moved to dismiss, Defendants reframe it as a hindsight returns-only challenge. The Complaint alleges that the American Century One Choice target-date series (the "AC TDFs")—funds Defendants allowed to grow to between 68% and 76% of all Plan assets—trailed four of the largest target-date suites in 512 of 534 comparisons across thirteen accepted metrics, vintage by vintage, on risk-adjusted measures *as well as raw returns*. Those suites are the American Funds Target Date Retirement Series ("American Funds"), T. Rowe Price Target Series ("T. Rowe Price"), Vanguard Target Retirement Series ("Vanguard"), and BlackRock LifePath Index Series ("BlackRock") (together, the "Comparator Suites"). A prudent fiduciary reviewing that record, quarter after quarter, would have removed the AC TDFs. Defendants did not. Instead of answering those allegations, Defendants' motion to dismiss (ECF No. 13-1, the "Motion" or "MTD") recasts them as something smaller and easier to defeat.

The Motion's opening pages are devoted not to what the Complaint pleads but to who pleaded it. Defendants call the case a "meritless goat," a "recycle[d] . . . template," a "copycat" complaint running an "identical" "playbook," and one of thirteen "strike suits." MTD at 1-2. None of that bears on Rule 12(b)(6). The "careful, context-sensitive scrutiny" *Dudenhoeffer* requires sorts complaints by the strength of their allegations, not by how many times the same funds have been challenged. *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014). But the same dismissiveness Defendants show Plaintiffs' counsel they show the Complaint's well-pleaded facts—and there it is fatal. Defendants brand the Complaint's risk-adjusted metrics "irrelevant" and "exotic," MTD at 2, 15, and decline to engage them at all.

That refusal is the heart of the Motion's failure. The Complaint does not rest on raw returns. It pleads thirteen metrics, eleven of which go beyond raw return. The risk-adjusted measures among them—the Sharpe, Sortino, Alpha, and Information Ratio measures—hold a fund's risk

1

constant and ask what return it delivered for the risk it took. By construction, those metrics answer Defendants' central defense—that the AC TDFs were simply "conservative," so their lower returns were the prudent price of safety. A genuinely conservative fund that was prudently managed would post competitive risk-adjusted returns; the AC TDFs trailed all four comparators on the risk-adjusted measures in nearly every pleaded comparison, which means they delivered less return for the risk actually borne. That is inefficiency, not caution. Defendants have no answer to it on the merits. They engage only raw trailing returns—two of the thirteen metrics, and the single dimension on which a deliberately lower-risk fund is most readily forgiven—and wave away the other eleven as a "scattershot." MTD at 15. Most tellingly, Defendants themselves defend the funds as delivering "steadier *risk-adjusted* returns over time," MTD at 5 (emphasis added), even as they dismiss as "irrelevant" the very risk-adjusted metrics that measure that contention—and on which the Complaint pleads the funds failed. Risk-adjusted analysis is not a litigation device; it is what ERISA's duty of prudence requires.

The narrowing also depends on misreading the Complaint and Defendants' own exhibits, which refute the premises of their motion. Defendants brand the AC series uniquely "conservative," but their chart classifies BlackRock LifePath—like the AC TDFs, a "to" suite—at 93% equity, the most "aggressive" allocation of all five suites, while the AC TDFs "to" series carries the least. MTD at 6. The "to"/"through" labels and allocations Defendants press thus do not track risk, just as the Complaint pleads: the distinctions are "somewhat arbitrary," and the AC series holds "more equity exposure at retirement than some 'through retirement' glide paths." Compl. ¶ 36. Defendants likewise say the metrics "refute" the claim, MTD at 15-16, but the very Appendix A pages they cite show the AC vintages posting negative three-year Alphas in 2018 and five-year batting averages below .500. Compl. App'x A. And they invoke this Court's decision in

*Ruebel*—a case that credited an undisputed, complaint-cited chart drawn from the plan's own Form 5500s—as if it licensed crediting attorney-assembled Morningstar tables offered to contradict a well-pleaded complaint. It does not. The "sleight of hand" Defendants attribute to Plaintiffs, MTD at 7, is their own.

The motion should be denied for four reasons. First, the Complaint pleads a meaningful benchmark: four named, investable, market-leading peer suites, measured against the AC TDFs across thirteen metrics and vintages, with risk-adjusted measures that answer the "different strategy" defense. Second, the Complaint pleads imprudence, not mere underperformance, through the breadth, duration, extraordinary concentration, and unheeded quarterly warnings from which the Eighth Circuit permits an inference of a flawed process. Third, the Eighth Circuit has adopted no magnitude or duration floor, and the Fiduciaries' continuing duty to monitor—together with the Plan's pleaded losses of $5.7 to $11.9 million per comparator from 2020 through 2024—carries the claim into the Class Period. Fourth, the failure-to-monitor count survives because the prudence count survives and is independently pleaded.

## BACKGROUND

The Washington Regional 401(k) Plan (the "Plan") is a defined-contribution retirement plan that, by the end of 2024, held $240,478,666 for 4,085 participants. Plaintiffs' Class Action Complaint (ECF No. 2, the "Compl.") ¶ 19. Washington Regional Medical System (the "Company") is the Plan's sponsor and a named fiduciary, and it appoints the members of the Pension Committee (the "Committee") that oversees the Plan's investments. *Id.* ¶¶ 12-13. The Company and the Committee (together, "Defendants" or the "Fiduciaries") selected the AC TDFs for the Plan, and the AC TDFs became its dominant holding. *Id.* ¶¶ 9, 40-41. The AC TDFs held between 68% and 76% of all Plan assets from 2020 through 2024. *Id.* ¶ 41.

Target-date funds are the most popular investment option in 401(k) plans, and sponsors often choose them as the plan's default. Compl. ¶ 27. Each fund follows a "glide path" that shifts from equities toward bonds as the target retirement year—the fund's "vintage"—approaches. *Id.* ¶¶ 28, 33. Funds are sometimes labeled "to" or "through," but "these distinctions and categorizations are somewhat arbitrary." *Id.* ¶ 36. The AC TDFs—a "to" series—in fact "have more equity exposure at retirement than some 'through retirement' glide paths." *Id.* And every target-date series, whatever its label, is "actively managed because of the continuous work of shifting the asset allocation of each vintage along the glide path." *Id.* ¶ 37.

The target-date universe is small and concentrated. In 2024, only thirty-seven established series carried a fifteen-year record, and the five largest held roughly 80% of all target-date assets. *Id.* ¶ 42. Because the universe is so concentrated, a prudent fiduciary "would always consider and compare, at a minimum," the four market-leading Comparator Suites the Complaint names: the American Funds, Vanguard, T. Rowe Price, and BlackRock target-date series. *Id.* ¶ 61. American Century itself benchmarked the AC TDFs against the American Funds suite. *Id.* ¶ 65 n.11.

Measured against those four suites across thirteen Modern Portfolio Theory ("MPT") metrics—including the risk-adjusted Sharpe, Sortino, Alpha, and Information Ratio metrics—the AC TDFs trailed in 512 of 534 comparisons (96%) over 2018 and 2019—vintage by vintage, across both the three- and five-year windows. *Id.* ¶¶ 53-54, 67. That grid reflects "the two years immediately preceding the Class Period," the most current data available to the Fiduciaries in 2020. *Id.* ¶ 94. And the harm did not stop there: the Complaint pleads that retaining the AC TDFs from January 2020 through December 2024 cost the Plan approximately $11.9 million against American Funds, $10.4 million against T. Rowe Price, $6.9 million against Vanguard, and $5.7 million against BlackRock. *Id.* ¶ 68.

4

Defendants retained the AC TDFs from roughly 2016 through at least the end of 2024. *Id.* ¶ 62. A plan of this size required quarterly investment reviews, giving the Fiduciaries "four opportunities" in 2019 alone—and the absolute latest point of the Q1 2020 meeting—to act on the adverse data before them. *Id.* ¶ 93. They did not. Defendants now move to dismiss, asking the Court to read the MTD's exhibits—attorney-assembled Morningstar tables of post-2019 allocations and returns—as proof that the AC TDFs were a prudent hold.

### LEGAL STANDARDS

A complaint survives a Rule 12(b)(6) motion if it "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court accepts the well-pleaded allegations as true and draws all inferences in Plaintiffs' favor. *Id.* The Complaint "should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009).

Because "ERISA plaintiffs generally lack the inside information necessary to make out their claims in detail," they may plead a fiduciary breach circumstantially. *Id.* at 598. Demanding direct allegations about a committee's internal deliberations—facts that "tend systemically to be in the sole possession of defendants"—would mean "the remedial scheme of the statute will fail." *Id.* at 596-98. So a prudence claim survives when the well-pleaded facts allow the court "to infer from what is alleged that the process was flawed"; "[c]ircumstantial allegations about the fiduciary's methods" drawn from the investment choices a fiduciary made "can be enough." *Davis v. Wash. Univ. in St. Louis*, 960 F.3d 478, 482-83 (8th Cir. 2020).

ERISA's duty of prudence is process-based and context-specific, not a set of bright-line rules. Prudence "turns on 'the circumstances . . . prevailing' at the time the fiduciary acts," so "the appropriate inquiry will necessarily be context specific," and a categorical magnitude-or-duration

rule cannot be reconciled with that inquiry. *Hughes v. Nw. Univ.*, 595 U.S. 170, 177 (2022). That duty is also continuing: a fiduciary "has a continuing duty to monitor trust investments and remove imprudent ones" that "exists separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset." *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015). "A plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Id.* at 530.

## ARGUMENT

The motion poses a single question: whether the Complaint, read as a whole, supports a plausible inference that the Fiduciaries' process for retaining a fund that held three-quarters of the Plan's assets was flawed. It does, for four reasons set forth below. The motion's contrary arguments depend on narrowing the Complaint to a "returns-only" pleading it is not by setting aside eleven of the thirteen metrics the Complaint pleads so that the Motion can be fought on the two most favorable to Defendants' arguments.

**I.  The Complaint pleads a meaningful benchmark: four named, investable, market-leading peer suites across thirteen accepted metrics, vintage by vintage.**

Defendants' lead argument is that the Complaint pleads no meaningful benchmark. MTD at 9-11. But that argument misstates the law and the allegations. To start, the Eighth Circuit does not require a plaintiff to plead a clone of the challenged fund; it requires "a sound basis for comparison—a meaningful benchmark." *Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 278 (8th Cir. 2022) (quoting *Davis v. Wash. Univ. in St. Louis*, 960 F.3d 478, 484 (8th Cir. 2020)). The Complaint supplies that and more: four named, investable, market-leading peer suites, measured against the AC TDFs across thirteen accepted MPT metrics, vintage by vintage, in a concentrated universe of only thirty-seven established series.

**A. The four named, market-leading suites provide a sound basis for comparison because they share the AC TDFs' market, category, and MPT constraints.**

The Complaint does not, as Defendants say, "allege only" that the AC TDFs use a "to" glide path and "say nothing" about the comparators. MTD at 9. To the contrary, it identifies the four Comparator Suites that dominate the target-date market—American Funds, Vanguard, T. Rowe Price, and BlackRock—and pleads why each is a proper comparator: all are off-the-shelf series "constrained by MPT" that "compete with each other for investment dollars," Compl. ¶ 39, in a universe so small that the top five hold roughly 80% of all target-date assets, *id.* ¶¶ 42, 61. The "to" and "through" labels Defendants invoke do not control. The Complaint alleges that those labels are "somewhat arbitrary" and that the AC "to" series in fact holds "more equity exposure at retirement than some 'through retirement' glide paths." Compl. ¶ 36. American Century itself, moreover, benchmarked the AC TDFs against the American Funds suite. *Id.* ¶ 65 n.11. The Fiduciaries cannot reasonably characterize the American Funds suite as categorically incomparable when American Century itself selected that suite as the benchmark for the AC TDFs at one point. A complaint alleging that a manager-selected benchmark outperformed pleads a "sound basis for comparison." *See Trauernicht v. Genworth Fin. Inc.*, 2023 WL 5961651, at *13 (E.D. Va. Sept. 13, 2023) (treating a sponsor-designated comparator as a sound basis for comparison).

Courts applying the meaningful-benchmark standard to this very AC TDF suite have denied dismissal. Mere months ago, the District of Arizona did so. *McGeathy v. Reinalt-Thomas Corp.*, No. CV-25-01439-PHX-DLR, 2026 WL 617343, at *2-3 (D. Ariz. Mar. 5, 2026). It held that comparators sharing "similar aims, risks, and potential rewards" suffice, and rejected the defendant's demand for structural twins because that would "require a plaintiff alleging imprudence to not just compare apples to apples but only Gala apples to Gala apples and Fuji

7

apples to Fuji apples." *Id.* at *3. That ruling maps directly onto this Complaint. The *McGeathy* plaintiff prevailed because he "evaluate[d] the aims, risks, and potential rewards of each comparator fund" and "describe[d] the glide path of each comparator fund and the types of investments they engage in," rather than "merely label[ing]" them comparable. *Id.* This Complaint does the same, and more—four named, investable suites that share the AC TDFs' market, category, and MPT constraints measured vintage-by-vintage across thirteen MPT metrics, Compl. ¶¶ 53-54, 61, 67—and two of the suites *McGeathy* held were meaningful benchmarks, American Funds and Vanguard, are among the four pleaded here. *McGeathy*, 2026 WL 617343, at *3. The court also held that the defendant's "disputes about the facts concerning each comparator fund are more appropriate for summary judgment," *id.*—the same answer to Defendants' comparability attack here. The court in *Rubke v. ServiceNow, Inc.* denied dismissal of a second amended complaint pleaded with similar circumstantial process allegations. No. 3:24-cv-01050-TLT, ECF No. 90, at 7-8 (N.D. Cal. Apr. 22, 2025).

In *Doll v. Evergy*, the Western District of Missouri also denied dismissal of an imprudent-retention claim challenging the AC TDF suite. 2025 WL 4042583, at *3-4 (W.D. Mo. Sept. 10, 2025). Two aspects of *Doll* are relevant. First, it distinguished *Meiners* on the ground that separates this Complaint from a one-fund case: "Unlike the plaintiff in *Meiners*, who only pled that one comparable fund performed better than the challenged funds, Plaintiffs here allege that American Century TDFs underperformed comparable TDFs *and* specific incidences where Defendants failed to evaluate and monitor the American Century TDFs in accordance with their guidelines." *Id.* at *4 (internal quotation and alterations omitted). This Complaint pleads not one comparator but four, across thirteen metrics—further still from *Meiners* than *Doll* was. Compl. ¶¶ 53-54, 67. Second, *Doll* recognized an independent path to survival: "significant allegations of wrongdoing" in the

8

fiduciary process "eliminate the need to infer a fiduciary breach through use of meaningful benchmarks." *Id.* at *3 (sustaining the claim on pleaded process failures, including violations of the watch-list protocol and a multi-year delay in removing imprudent funds). This Complaint pleads the same kind of failure to act on repeated warning signs. Quarterly reviews gave the Fiduciaries four chances in 2019, and the Q1 2020 meeting at the latest, to act on the data before them and they did not. Compl. ¶¶ 92-94.

*Snyder v. UnitedHealth Group* is also instructive—there, the court sustained a target-date imprudence claim over the same objections Defendants raise here. 2021 WL 5745852, at *3-4 (D. Minn. Dec. 2, 2021). It held that funds within the "same peer universe" are meaningful benchmarks notwithstanding differences in glide paths and asset allocations, and that the plan fiduciary's own use of a comparator "strongly supports an inference" that the comparison is meaningful. *Id*. at *3-4. The court also declined to infer at the pleading stage that the challenged funds underperformed because they were "more conservative," explaining that the court could not draw that inference in the defendants' favor on a motion to dismiss. *Id*. Finally, the court held that outperformance "in one year alone does not preclude" reliance on longer-term cumulative underperformance. *Id*. at *3.

Those principles apply here. American Century itself benchmarked the AC TDFs against the American Funds suite, reinforcing the inference that American Funds provides a meaningful comparator. Compl. ¶ 65 n.11. Defendants' contention that the AC TDFs underperformed because they were more conservative likewise presents a factual inference that cannot be drawn in their favor at this stage. MTD at 5, 11. And isolated years of positive performance do not negate the Complaint's allegations of sustained, cumulative underperformance.

Defendants' own authorities confirm the point rather than defeat it. None bars comparisons between target-date suites with differing glide paths or allocations; each instead asks whether the

9

complaint explains why the proposed comparators furnish a sound basis for comparison. The claims dismissed in those cases failed that test because the plaintiffs never supplied the explanation. This Complaint does.

In *Matousek v. MidAmerican Energy Co.*, the plaintiffs relied on undefined peer groups whose composition "remain[ed] a mystery." 51 F.4th 274, 281 (8th Cir. 2022). The complaint did not identify the types of funds included in those groups or allege that they held similar securities, pursued similar strategies, or reflected similar risk profiles. *Id*. The district-court decisions Defendants cite involved the same deficiency. *See Fitzpatrick v. Neb. Methodist Health Sys., Inc.*, 2023 WL 5105362, at *7 (D. Neb. Aug. 9, 2023) (dismissing where plaintiffs relied on Morningstar categories but alleged nothing about the comparator funds' asset allocations, investment strategies, or risk profiles, so that, "[a]s in *Matousek*, 'the composition of the peer groups remain[ed] a mystery'"); *Riley v. Olin Corp.*, 2023 WL 371872, at *4-7 (E.D. Mo. Jan. 24, 2023) (rejecting comparators where plaintiffs "[did] not allege anything about the funds' holdings, investment style, or strategy that shows how the comparator funds qualify as meaningful benchmarks"). Here, by contrast, the Complaint identifies four specific, investable suites—American Funds, Vanguard, T. Rowe Price, and BlackRock—and explains why they are comparable to the AC TDFs. Each is an off-the-shelf target-date series, each is "constrained by MPT," and each "compete[s] with [the others] for investment dollars" in a concentrated market in which the five largest providers hold approximately 80% of target-date assets. Compl. ¶¶ 39, 42, 61. *Matousek* dismissed because the plaintiffs never said what was in their peer groups; this Complaint says exactly what its comparators are and why they are comparable.

In *Meiners v. Wells Fargo & Co.*, the plaintiff identified only one alternative fund and alleged merely that it followed a different strategy and ultimately performed better. 898 F.3d 820,

10

823 (8th Cir. 2018). That allegation, standing alone, did not plausibly show that the challenged investment was imprudent. *Id*. This Complaint does not rest on one fund or hindsight performance alone. It compares the AC TDFs with four peer suites across thirteen measures and multiple vintages, alleging that the AC TDFs trailed in 512 of 534 comparisons. Compl. ¶¶ 53-54, 67. As another court in this Circuit has recognized, allegations involving multiple comparators and a broader pattern of underperformance present a materially different case from *Meiners*. *See Doll*, 2025 WL 4042583, at *4.

*Davis v. Wash. Univ. in St. Louis* involved comparisons among fundamentally different investment products: an index and an actively managed real-estate account, stock funds and a variable-annuity account, and a fixed annuity for which no comparator was identified. 960 F.3d 478, 484-87 (8th Cir. 2020). Because those products had "different aims, different risks, and different potential rewards," they did not provide a meaningful basis for comparison. *Id*. at 485. The comparisons here are not cross-product comparisons. The Complaint compares target-date suites with target-date suites—investments that share the same retirement-allocation purpose and the same glide-path structure. Whatever differences exist among their allocations, they are competitors within the same investment category, not the fundamentally incommensurable products at issue in *Davis*.

*Smith v. CommonSpirit Health* likewise involved a different comparison—the plaintiff compared an actively managed suite with its own passively managed index counterpart, even though the two funds had "distinct goals and distinct strategies." 37 F.4th 1160, 1167 (6th Cir. 2022). And *Abel v. CMFG Life Ins. Co.* rejected comparators selected on the basis of market share alone, 2024 WL 307489, at *5 (W.D. Wis. Jan. 26, 2024), while *Luckett v. Wintrust Fin. Corp.* rejected the pleaded comparators as "apples to oranges" given their active-versus-passive and

11

glide-path differences, 2024 WL 3823175, at *4 (N.D. Ill. Aug. 14, 2024)—neither tied to the challenged fund's design, strategy, or risk. This Complaint does not share those defects. It identifies four independent, off-the-shelf target-date suites and alleges comparability based not merely on their market position, but on their shared product category, competitive market, investment purpose, and MPT constraints. Compl. ¶¶ 36-37, 42-44, 61.

One thread runs through all four cases: each turned on a comparator the plaintiff never tied to the challenged fund's strategy or risk. This Complaint does that and more. The "different strategy" objection that doomed *Meiners* and *Smith* fails here on its own terms, because the comparison is risk-adjusted. The Sharpe, Sortino, Alpha, and Information Ratio metrics hold a fund's risk constant and absorb the very allocation and glide-path differences Defendants invoke. A comparison that neutralizes the strategic difference is not "apples to oranges." It is the like-for-like comparison the law requires.

Whether the four named suites are similar enough to serve as benchmarks is, in any event, a question of fact the Court cannot resolve on the pleadings. Confronted with the argument that retention fell within the "range of reasonable judgments" fiduciaries may make, the *Doll v. Evergy* court held that "such an argument concerns factual disputes not appropriate for a motion to dismiss." 2025 WL 4042583, at *3. And courts addressing benchmark adequacy have reached the same conclusion. *See Carter v. Sentara Healthcare Fid. Comm.*, 2025 WL 2427614, at *6 (E.D. Va. Aug. 11, 2025) (benchmark adequacy "is highly factual," so "any disagreement about which funds should be used as benchmarks is more appropriate for summary judgment"). Defendants nevertheless ask the Court to hold, as a matter of law, that four specific, market-leading target-date suites cannot provide a meaningful basis for comparison. That is not the inquiry at this stage. The question is whether the Complaint plausibly explains why the suites are comparable; it does.

12

*Phillips v. Cobham Advanced Elec. Sols., Inc.*, No. 23-CV-03785-EKL, 2025 WL 2689268 (N.D. Cal. Sept. 19, 2025) does not require a different result; it involved materially different allegations. There, the plaintiff relied on Morningstar peer-group classifications, a non-investable S&P index, and comparator funds that the court found insufficiently comparable on the facts pleaded. 2025 WL 2689268, at *2, *5-9. The comparator sets barely overlap. The *Phillips* plaintiffs pleaded seven suites—American Funds, Callan GlidePath, MoA Clear Passage, Natixis, Nuveen Lifecycle, T. Rowe Price, and Voya—omitting Vanguard and BlackRock, two of the largest, most widely benchmarked index suites pleaded here. *Phillips*, 2025 WL 2689268, at *6. Only American Funds and T. Rowe Price appear in both cases, and as to those the *Phillips* complaint never alleged why they furnished a sound basis for comparison or that American Century itself used a suite to benchmark the AC TDFs—gaps filled by this Complaint. Compl. ¶¶ 39, 42, 44, 61, 65 n.11.

Indeed, this Complaint supplies what was missing. It identifies four specific, investable, market-leading TDF suites; explains why prudent fiduciaries compare leading suites within the concentrated target-date market despite modest glide-path differences; alleges that the "to" and "through" labels are not reliable proxies for investment risk because some "to retirement" suites— including the AC TDFs—hold more equity at retirement than some "through retirement" suites; and pleads that American Century's own managers benchmarked the AC TDFs against American Funds. Compl. ¶¶ 36, 39, 42, 44, 61, 65 n.11. Those allegations establish a sound basis for comparison and undermine Defendants' contention that glide-path labels or modest design differences render the Comparator Suites incomparable. As the Complaint alleges, meaningful comparison in the concentrated TDF market does not require the competing suites to be identical. *Id.* ¶¶ 42, 44.

And *Phillips* turned on the pleading before the court. The court dismissed a fourth amended complaint—after three prior pleadings failed—because the specific comparators failed on the facts. Two of the three were not specific, investable comparator funds at all: a Morningstar peer group of "more than 200 funds" that is "an average of a large group of funds," and a non-investable S&P index that "is not an actual alternative investment that the Plan could have selected." 2025 WL 2689268, at *5-6. As for the seven named suites, the court ruled that the plaintiffs' amended allegations "simply restate[d] [their] prior, insufficient allegations that the comparators [were] meaningful benchmarks because they are all target date funds." *Id*. at *6. Moreover, the court's conclusions about allocation deltas and strategy differences were driven by data pleaded in the plaintiffs' complaint—U.S. equity, non-U.S. equity, fixed income, other, cash, and unclassified positions. *Id*. (citing ECF No. 79 ¶ 125). Secondarily, the court examined glide path differences. *Id*. at *7. The *Phillips* decision is entirely bound to its facts.

*Phillips* reflects no gate adopted in the Ninth Circuit, let alone the Eighth Circuit. For instance, applying that standard to the AC TDFs, the *McGeathy v. Reinalt-Thomas Corp.* court reached the opposite conclusion and rejected the structural twin demand. No. CV-25-01439-PHX-DLR, 2026 WL 617343, at *3 (D. Ariz. Mar. 5, 2026). Indeed, *Dawson v. Brookfield Asset Mgmt. LLC* acknowledged that *McGeathy* "did find that the plaintiff alleged meaningful benchmarks and underperformance relative to American Century TDFs," but disagreed with the court's level of analysis "as to why the underperformance was sufficiently alleged." 2026 WL 835553, at *18 n.14 (N.D. Ohio Mar. 26, 2026). The split is not over whether a four-suite benchmark can be pleaded. Even *Dawson* recognized it can. And this Complaint pleads one: four named, investable suites, measured across thirteen metrics, vintage by vintage, normalized for risk, with the manager's own benchmark and the Fiduciaries' repeated failures to act. Compl. ¶¶ 61, 65 n.11, 67-68, 92-94.

14

**B. Risk-adjusted metrics neutralize the "conservative strategy" argument by measuring return per unit of risk actually borne.**

Defendants' fallback argument—that the AC TDFs are simply "conservative," so their lower returns were the prudent price of safety—lacks merit because the risk-adjusted metrics measure the very thing that argument puts at issue: return per unit of risk actually borne. Alpha, the Sharpe Ratio, the Sortino Ratio, and the Information Ratio are risk-adjusted by construction; each holds a fund's risk constant and asks what return the fund delivered for that risk. Compl. ¶¶ 53-54. If the AC TDFs delivered less return for the risk they took, then their lower raw return is *not* the price of safety but evidence of inefficiency (the Complaint pleads they trailed all four comparators on Sharpe, Sortino, and Alpha in the overwhelming majority of the pleaded comparisons across the pleaded windows). *Id.* ¶¶ 53-54, 67. And because each target-date series takes on relatively more or less risk through its glide path, the risk-adjusted metrics are the most important measure for comparing them. *Id.* ¶¶ 51-52.

Rather than engage those metrics, however, Defendants wave them away. They brand the Complaint's risk-adjusted measures "irrelevant" and "exotic," the product of Plaintiffs "stuff[ing] their Complaint" with metrics in "hop[e] to get by on volume rather than substance," and fight the motion on raw trailing returns alone—two of the thirteen pleaded metrics. MTD at 2, 15. But risk-adjusted analysis is not an invention of the plaintiffs' bar—it is a component part of ERISA's fiduciary duties. ERISA's duty of prudence requires a fiduciary to give appropriate consideration to "the risk of loss and the opportunity for gain (or other return) associated with the investment . . . compared to . . . reasonably available alternatives with similar risks," 29 C.F.R. § 2550.404a-1(b)(2)(i), and Modern Portfolio Theory "has been adopted in the investment community and, for the purposes of ERISA, by the Department of Labor." *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 423 (4th Cir. 2007); *see also Anderson v. Intel Corp. Inv. Pol'y Comm.*, 137 F.4th 1015, 1024 (9th

15

Cir. 2025) (a fiduciary must "act as a prudent investment manager following the principles of modern portfolio theory"); *Pfeil v. State Street Bank & Tr. Co.*, 806 F.3d 377, 386 (6th Cir. 2015) (recognizing that "the prudence norm in trust law and in ERISA has absorbed the main precepts of MPT" (quoting John H. Langbein et al., *Pension and Employee Benefit Law* 634)). The Sharpe and Sortino ratios, Alpha, and the Information Ratio are the standard tools by which that risk-and-return inquiry is measured. Defendants cannot dismiss them as a distraction while simultaneously defending the AC TDFs as designed to "deliver steadier ***risk-adjusted*** returns over time"—the very "feature" they say justifies the funds' lower returns. MTD at 5 (emphasis added). Having staked their arguments on the funds' risk-adjusted performance, Defendants cannot also ask the Court to ignore the risk-adjusted metrics that measure it, and on which the Complaint pleads the AC TDFs trailed every Comparator Suite.

American Century's own marketing sharpens the contradiction: it touts the Sharpe Ratio as a measure of "more return for the same amount of risk." Compl. ¶ 53. Defendants cannot credit the manager's branding of its product as "conservative" when it helps them, MTD at 5, while ignoring the risk-adjusted metric the manager itself promotes—and on which the fund failed. The conservative premise fails on the face of the Complaint in any event: the AC "to" series carried "more equity exposure at retirement than some 'through retirement' glide paths," and a fund that holds more equity at retirement than its peers is not categorically less risky. Compl. ¶ 36.

Whether a risk-adjusted measure is the right lens for these funds is, at most, a question of fact. "The determination of whether the Sharpe ratio is an appropriate benchmark is a fact issue that is not properly determined at this stage of the case." *Kistler v. Stanley Black & Decker, Inc.*, No. 3:22-cv-966, 2024 WL 3292543, at *10 (D. Conn. July 3, 2024).

16

Defendants' contrary authorities do not hold otherwise. Each turned on a pleading-stage shortfall in a different complaint, not a rule that risk-adjusted or efficiency metrics are immaterial as a matter of law. *See Hall v. Cap. One Fin. Corp.*, No. 1:22-cv-00857, 2023 WL 2333304, at *6, *7 & n.6 (E.D. Va. Mar. 1, 2023) (declining to credit the Sharpe ratio where the complaint pleaded comparator "rank" but "d[id] not include the actual numerical values," and stayed "silent" on the comparators' glide paths, active-versus-passive design, and asset allocations); *Beldock v. Microsoft Corp.*, No. 2:22-cv-01082, 2023 WL 3058016, at *3 & n.7 (W.D. Wash. Apr. 24, 2023) (declining to reach "whether Plaintiffs' proposed comparators are meaningful benchmarks" because the claim rested "solely on alleged underperformance"); *Dawson*, 2026 WL 835553, at *20 (rejecting a turnover allegation "standing alone" after finding no material underperformance—the funds there "marginally underperformed . . . by less than 1%, and even outperformed their alleged comparators"); *Phillips v. Cobham Advanced Elec. Sols., Inc.*, No. 5:23-CV-03785-EKL, 2025 WL 2689268, at *7 (N.D. Cal. Sept. 19, 2025) (setting aside a Beta allegation only after finding the comparators inapt in a fourth amended complaint). This Complaint supplies what those complaints lacked. It pleads the Comparator Suites' design and the "to"/"through" equity-at-retirement point, *see* Compl. ¶ 36, and the actual metric values across the grid, not bare rankings, *id.* ¶¶ 52-54, 67 & App'x A. *Kistler* itself reached its fact-issue holding while confronting *Hall*, and declined to dismiss on the very ground Defendants press. *Kistler*, 2024 WL 3292543, at *10.

Defendants' affirmative reading of the metrics fares worse because it misstates the Complaint's Appendix A. Defendants assert that "[s]everal American Century TDF vintages posted positive Alphas in 2018 and 2019" and so "outperformed expectations." MTD at 15 (citing Compl. App'x A at 4, 6, 8, 10, 12, 14). The Appendix shows the opposite. Defendants name no vintages, but each of the six Appendix A pages they cite reports a negative three-year Alpha for the AC TDF

17

vintage in 2018: the 2035 vintage at -0.66%, the 2040 at -0.54%, the 2045 and 2050 at -0.46%, the 2055 at -0.47%, and the 2060 at -0.51%. Compl. App'x A at 4, 6, 8, 10, 12, 14. Positive Alphas appear only in 2019, and even then incompletely—the 2035 vintage's three-year Alpha remains negative. Moreover, Alpha measures a fund's return against what "its beta would predict," *not* against the Comparator Suites. *Id.* ¶ 53. A positive Alpha means a fund beat its own risk-adjusted expectation; it says nothing about whether the AC TDFs beat American Funds or Vanguard. And on the same pages, the comparators' Alphas run materially higher than the AC TDFs'. *Id.* App'x A. The metric Defendants invoke to show prudence instead shows the AC TDFs trailing.

The batting-average figures Defendants cite cut the same way. Defendants say the AC TDFs' five-year batting averages of ".433 to .517" mean the funds "matched or exceeded the market 43% to nearly 52% of the time." MTD at 15-16. But a batting average measures how often a fund beat or matched its benchmark, and the Complaint supplies the midpoint: "[a] manager who beats the market half of the time would have a batting average of .500." Compl. ¶ 54. Four of the six figures Defendants cite fall below that .500 benchmark. The lowest, .433, meaning the AC TDFs matched or beat their benchmark only about 43% of the time, and trailed it the other 57%. *Id.* App'x A. Those figures do not rebut the alleged pattern of underperformance. To the contrary, the fact that most of the cited batting averages fall below .500 reinforces the allegation that the AC TDFs more often trailed their benchmarks than matched or beat them.

### C. The extrinsic Morningstar appendices cannot defeat comparability on the pleadings, and on their own numbers they reinforce the Complaint.

Defendants attach a declaration and a set of appendices—Morningstar tables of asset allocations as of March 2020 and trailing returns as of March 2020 and December 2022—and ask the Court to find, as a matter of law, that the AC TDFs were prudent. The Court should decline the invitation for three reasons: (1) the appendices may not be considered on a Rule 12(b)(6) motion;

18

(2) even if considered, they bear on the weight of the comparison, not the sufficiency of the pleading; and (3) on their own numbers—raw trailing returns alone, two of the Complaint's thirteen metrics—they corroborate the Complaint rather than refute it.

**1. The Court should not consider the extrinsic appendices, which postdate the pleaded data and are offered to contradict it.**

On a Rule 12(b)(6) motion, the court generally must ignore materials outside the pleadings. The Eighth Circuit recognizes only narrow exceptions—for materials "that are part of the public record or do not contradict the complaint," and documents "necessarily embraced by the pleadings." *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999). Appendices B, C, and D meet none of those exceptions. They are not attached to, incorporated in, or necessarily embraced by the Complaint. They are fresh compilations of third-party Morningstar data, reporting March 2020 allocations and post-2019 returns—figures that postdate the 2018-2019 record the Fiduciaries had before them. Their one purpose is to contradict the Complaint's allegation that the AC TDFs trailed every Comparator Suite across the pleaded thirteen-metric grid. Materials offered for their truth to rebut well-pleaded allegations fit neither exception, and crediting them would convert the motion into one for summary judgment without the notice Rule 12(d) requires. *See* Fed. R. Civ. P. 12(d).

Nor do the appendices fill any gap. The Complaint pleads a thirteen-metric, risk-adjusted comparison that already accounts for the purported allocation and risk differences in Appendix B. Defendants rest their incomparability conclusion on labels—"to" versus "through"—and on raw equity and bond percentages. But they offer no objective metric that shows those allocations are or are not comparable. A column of raw percentages proves nothing about comparability, and the inference Defendants draw from it is not one the Court may draw against the Complaint at this stage. The Complaint's risk-adjusted metrics do the work those raw numbers cannot. As shown

above, Alpha, the Sharpe and Sortino Ratios, and the Information Ratio hold each fund's risk constant and measure return per unit of risk borne—and absorb the very glide-path differences Defendants point to with gross allocation figures. Compl. ¶¶ 52-54. The appendices add nothing the pleaded grid has not already weighed.

This Court need look no further than its own precedent. In *Ruebel v. Tyson Foods, Inc.*, this Court credited a defense-prepared asset-size chart on a Rule 12(b)(6) motion for three reasons absent here. No. 5:23-CV-5216, 2024 WL 3682230 (W.D. Ark. Aug. 6, 2024) (Brooks, J.). The data came from "each plan's Form 5500," a category the Eighth Circuit holds "may be considered" on a motion to dismiss an ERISA recordkeeping claim. That data was "cited in Paragraph 87 n.1 of the Amended Complaint." And the plaintiffs "agree[d] that the . . . chart contain[ed] accurate asset information." 2024 WL 3682230, at *4 & n.4 (citing *Matousek*, 51 F.4th at 279). Even then, the chart did no more than test the plaintiffs' own comparators against undisputed, complaint-supplied figures. The same opinion stated the limit: a court "generally must ignore materials outside the pleadings," and the exceptions reach only materials that "do not contradict the complaint" or are "necessarily embraced by the pleadings." *Id.* at *3 (quoting *Porous Media*, 186 F.3d at 1079). Appendices B, C, and D are the opposite of the *Ruebel* chart. They come not from the Plan's own filings but from third-party Morningstar data that Defendants assembled after suit was filed. No Eighth Circuit rule holds that such tables may be considered. And Plaintiffs do not concede their accuracy—they dispute the inference Defendants draw from them. The *Ruebel* chart satisfied all three conditions; Appendices B, C, and D satisfy none The rule this Court applied in *Ruebel* bars crediting them for their truth.

Defendants do not even argue that Appendices B, C, and D are incorporated into or necessarily embraced by the Complaint—nor could they, as the Complaint neither references nor

20

relies on these post-suit compilations. Their sole asserted basis for consideration is a single footnote invoking judicial notice of "Morningstar data." MTD at 13 n.9. That cursory treatment cannot carry the weight Defendants put on it, because judicial notice reaches a public document's *existence*, not the truth of the disputed figures within it or the contested inferences Defendants draw from them. *See N. Oil & Gas, Inc. v. EOG Res., Inc.*, 970 F.3d 889, 895 (8th Cir. 2020) (denying request for judicial notice, noting the request asked the court to accept the contents of certain contested documents as true).

Defendants' own authority agrees. In *Phillips*, the court declined to take judicial notice of fourteen of fifteen exhibits—including prospectus and Morningstar materials—because their "primary purpose" was "to supply additional information about the American Century TDFs and comparator funds to contradict [p]laintiffs' allegations," which the court "may not consider . . . for that purpose." 2025 WL 2689268, at *3. So too here. Judicial notice extends to a public document's existence, not to the truth of disputed figures within it or the contested inference Defendants draw. *See Baird v. BlackRock Inst. Tr. Co.*, 403 F. Supp. 3d 765, 775-77 (N.D. Cal. 2019) (refusing notice of rebuttal exhibits offered "for the truth . . . to rebut Plaintiffs' allegations"). Crediting the appendices for their truth would convert this motion into one for summary judgment without notice, which Rule 12(d) forbids.

### 2. Even if considered, the appendices go to the weight of the comparison, not to whether a meaningful benchmark has been pleaded.

Even if the Court considers Appendix B, it goes to weight, not sufficiency, because it confirms a single point: the "to"/"through" labels Defendants press do not track risk. The meaningful-benchmark standard asks for "a sound basis for comparison," not clones, *Davis*, 960 F.3d at 484, and percentage-point differences in equity and bond allocation are questions of degree for "factual development, rather than . . . the motion-to-dismiss stage." *Fezer v. Lockheed Martin*

*Corp.*, 2026 WL 1041276, at *7 (D. Md. Apr. 16, 2026); *accord McGeathy*, 2026 WL 617343, at *3. On Defendants' own numbers, the labels collapse three ways. First, the two funds Defendants label "to"—the AC series and BlackRock—sit at opposite extremes of equity exposure: at the 2045 vintage in Defendants' chart, BlackRock holds 93% equity, the most of all five suites, while the AC series holds the least at 71.2%. MTD at 6. As alleged, these labels are poor proxies for risk.

Second, at the Income vintage—the allocation a retiree actually holds—the AC "to" series carries *more* equity (43.2%) than the "through" Vanguard (29.9%) and BlackRock (37.8%) series, and fewer bonds (48.9%) than Vanguard (67.0%) or BlackRock (57.1%). ECF No. 13-4 at 2.

Third, at the 2030 vintage the AC series' 52.9% equity is all but identical to American Funds' 52.8%. *Id*. That is exactly what the Complaint pleads: the labels are "somewhat arbitrary," and the AC "to" series holds "more equity exposure at retirement than some 'through retirement' glide paths." Compl. ¶ 36. The labels Defendants press do not survive their own exhibits.

### 3. Even on their own terms, the appendices engage only raw return—two of the thirteen metrics—and stay silent on the eleven risk-adjusted and efficiency measures on which the AC TDFs trailed.

Defendants contend that Appendices C and D show the AC TDFs outperforming "a majority of" vintages after 2019. MTD at 13-14. But those appendices do not test the allegations the Complaint makes. They report only raw trailing returns—two of the thirteen measures in the Complaint's comparative framework—while omitting the eleven measures addressing risk-adjusted performance, benchmark-relative performance, consistency, and efficiency, including Sharpe ratio, Sortino ratio, alpha, Information Ratio, batting average, and turnover. *See* ECF Nos. 13-5, 13-6. That omission is particularly consequential because Defendants attribute the AC TDFs' lower returns to their supposedly conservative design. The omitted metrics are what test whether the funds delivered adequate performance for the risks they assumed, rather than merely whether their raw returns were higher or lower. The Complaint's 96% shortfall reflects the full thirteen-

22

metric analysis. Appendices C and D address only two measures and leave the remaining eleven unaddressed. Appendices C and D therefore are silent on the Complaint's 96% grid-wide shortfall; they isolate two raw-return measures while ignoring the eleven measures that test Defendants' conservatism explanation.

And even on that sliver, the "majority" Defendants tout is a statistical coin flip that proves nothing. By their own charts, the AC TDFs posted the "better trailing return" in just 53 of 95 periods (55.8%) in Appendix C and 54 of 103 (52.4%) in Appendix D—razor-thin edges reached only by sweeping in *every* window Morningstar reports, one-year and ten-year alike, much of it outside the 2018-2019 record the Complaint pleads. ECF No. 13-4 at 2; ECF No. 13-5 at 2. The Complaint, by contrast, pleads its MPT metrics on the three- and five-year trailing windows—the periods a fiduciary conducting the quarterly reviews this Plan required would actually have reviewed in 2019 and early 2020. Compl. ¶¶ 53, 93.

The appendices fail for a more basic reason: they are hindsight. Prudence is judged on "the information available to the fiduciary at the time of the relevant investment decision"—the very standard Defendants invoke. *Usenko v. MEMC LLC*, 926 F.3d 468, 473 (8th Cir. 2019); MTD at 8. Appendices B, C, and D report Morningstar data as of March 2020 and December 2022—months and years after the 2018-2019 record the Fiduciaries had before them—and Defendants offer that later data to contend the retention turned out well. Defendants cannot have it both ways. They cannot brand the Complaint's 2018-2019 grid "two arbitrary snapshots" while asking the Court to credit their own post-2019 returns for their truth, when prudence measures a fiduciary's process by what it knew, not by how the fund later performed. And later outperformance, where it exists, does not cure an imprudent retention. *Snyder*, 2021 WL 5745852, at *3.

The later data does Defendants no good in any event for two reasons. First, it engages only raw return—two of the Complaint's thirteen metrics—and stays silent on the eleven risk-adjusted, benchmark-relative, and efficiency measures on which the AC TDFs trailed and which alone test Defendants' "conservative design" explanation. Second, even confined to raw returns over the three- and five-year windows the Complaint uses, the data does not show the across-the-board outperformance Defendants assert: the AC TDFs trailed American Funds—the largest active suite and American Century's own chosen benchmark, Compl. ¶ 65 n.11—at every vintage Appendix C reports, and split the remaining comparisons, dissolving Defendants' all-window "majority" into a coin flip. ECF No. 13-5 at 2. Post-2019 raw returns thus neither rebut the pleaded grid nor cure the retention.

## II. The Complaint pleads imprudence, not mere underperformance, through circumstantial facts from which a flawed monitoring process may be inferred.

Defendants recast the Complaint as a bare-underperformance pleading and insist that Plaintiffs allege "zero facts" about the Fiduciaries' process. MTD at 8. That is both legally and factually wrong. Process, not results—the principle of *Braden* and *Smith*—is a rule about what makes a fiduciary's conduct actionable: prudence is judged by methods, not by hindsight outcomes. It is not a rule about what a plaintiff must allege. The Eighth Circuit settled that distinction in *Braden*. A plaintiff "cannot state a claim without pleading facts which tend systemically to be in the sole possession of defendants," so it is "sufficient . . . to plead facts indirectly showing unlawful behavior" from which the court can "infer . . . that the process was flawed." 588 F.3d at 595-98. Plaintiffs need not plead the contents of committee minutes they have never seen; "[c]ircumstantial allegations about the fiduciary's methods" drawn from the investment choices the Fiduciaries made are sufficient. *Davis*, 960 F.3d at 482-83.

24

The Complaint robustly pleads those circumstantial facts. First, breadth: the AC TDFs trailed four market-leading suites in 512 of 534 metric-comparisons (96%)—not in a single vintage, metric, or window, but across the whole grid. Compl. ¶¶ 67-68. Second, duration: the Fiduciaries retained the AC TDFs from roughly 2016 through at least the end of 2024, long after the data soured. *Id.* ¶ 62. Third, concentration: the AC TDFs held 68% to 76% of all Plan assets, *id.* ¶ 41, making their retention one of the Fiduciaries' "most important and impactful" "investment selection and monitoring responsibilities," *id.* ¶ 40. Fourth, and decisively, a recurring opportunity to act that the Fiduciaries did not take: a plan of this size "would require quarterly reviews," giving the Fiduciaries "four opportunities" in 2019 and, "the absolute latest," the Q1 2020 meeting to remove the AC TDFs on the data before them. *Id.* ¶ 93. The Complaint pleads a specific monitoring cadence and a specific deadline the Fiduciaries let pass without acting.

Read together, as they must be, those allegations make the inference of a flawed process not merely possible but plausible. *Braden*, 588 F.3d at 594. A fiduciary who, quarter after quarter, held three-quarters of a plan's assets in a fund that trailed every market-leading peer on nearly every measure—and never acted—did not, on these facts, employ a prudent process. Compl. ¶ 87. Defendants suggest that retention fell within "the range of reasonable judgments" a fiduciary may make. But whether a judgment was reasonable on this record is a question of fact, not a basis for dismissal. *Doll v. Evergy, Inc.*, 2025 WL 4042583, at *3 (W.D. Mo. Sept. 10, 2025) ("range of reasonable judgments" arguments "concern[] factual disputes not appropriate for a motion to dismiss"). The Complaint does not equate underperformance with imprudence. It pleads the breadth, duration, concentration, and unheeded warnings from which a flawed process may be inferred—which states a claim in the Eighth Circuit.

25

**III. The Eighth Circuit has adopted no magnitude or duration floor, and the pleaded grid states a claim that runs into the Class Period.**

Defendants' last argument reduces the Complaint to a pair of return spreads and asks the Court to dismiss because the spreads are, in Defendants' view, too small and too short. MTD at 11-16. The argument fails at every step, and it fails first by setting aside eleven of the thirteen metrics. The Eighth Circuit has adopted no magnitude or duration floor; ERISA's prudence inquiry "will necessarily be context specific," and a categorical floor cannot be squared with it. *Hughes*, 595 U.S. at 177. Nor is the pleaded data too stale to matter because it predates the Class Period— a premise that misreads both the duty of prudence and the Complaint.

The duty of prudence is continuing. A fiduciary "has a continuing duty to monitor trust investments and remove imprudent ones," and "must dispose of [an imprudent investment] within a reasonable time." *Tibble*, 575 U.S. at 529-30. The 2018-2019 grid contains the information the Fiduciaries had in front of them at the time of the retention decisions that fall squarely within the Class Period. The Complaint pleads that the grid reflects "the two years immediately preceding the Class Period," the most current data available to the Fiduciaries in 2020, and that a prudent fiduciary reviewing it at "the absolute latest" by the Q1 2020 meeting would have removed the AC TDFs. Compl. ¶¶ 93-94. Each quarter the Fiduciaries instead retained the fund was a fresh exercise of the continuing duty—and a fresh breach. The harm is pleaded in the Class Period too: retaining the AC TDFs from January 2020 through December 2024 cost the Plan approximately $11.9 million against American Funds, $10.4 million against T. Rowe Price, $6.9 million against Vanguard, and $5.7 million against BlackRock. *Id.* ¶ 68. A complaint that pleads both the data the fiduciaries ignored and the dollars the plan lost during the class period is not a stale snapshot.

**A. No binding authority sets a magnitude floor, and the shortfall is consistent across metrics, not a single spread.**

No controlling authority imposes an underperformance threshold for imprudence, and courts have declined to create such a rule. *See, e.g., Carter v. Sentara Healthcare Fid. Comm.*, 2025 WL 2427614, at *5 (E.D. Va. Aug. 11, 2025) (declining to hold a 1.36-percentage-point shortfall insufficient as a matter of law because a "bright-line rule seems inappropriate at the motion-to-dismiss stage"). Even a one percentage point shortfall is not trivial; the Department of Labor has illustrated that a single percentage point, compounded over a thirty-five-year career, can reduce a participant's ending account balance by roughly twenty-eight percent. U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, at 1-2. And because the AC TDFs held approximately three-quarters of the assets in a $240 million Plan, each percentage point of underperformance represents millions in foregone growth every year, before compounding.

Defendants' magnitude argument also inverts ERISA's compounding math. They brand even larger, multi-year shortfalls "immaterial" and would require "consistent, ten-year underperformance" that is "substantial," MTD at 13—treating a 7.03% gap as too small, *id.* at 14-15 (citing *Nolan v. Sonic Automotive, Inc.*, No. 3:25-CV-00474-KDB-WCM, 2026 WL 1195596, at *8 (W.D.N.C. May 1, 2026)), and demanding the Court withhold scrutiny until the loss is all but irreversible. A magnitude floor of that kind would gut the duty to monitor precisely where it matters most. Defendants' characterization of the gap as minor thus understates the magnitude of the difference in a base return environment where every percentage point carries outsized weight. Tethering the duty to monitor to such a high threshold would effectively render that duty a nullity in the lower-return TDF space, where absolute performance figures are modest by design and meaningful underperformance may never breach an absolute percentage threshold—even when the relative gap is severe. ERISA's prudence standard demands more than a mechanical floor; it

27

requires ongoing, context-sensitive evaluation of whether participants are receiving the investment quality the market readily provides. *Hughes*, 595 U.S. at 177.

That is why courts confronting the same argument decline to set one. *See Carter v. Sentara Healthcare Fid. Comm.*, 2025 WL 2427614, at *5 (E.D. Va. Aug. 11, 2025) (declining to hold 1.36% insufficient as a matter of law and stating: "These decisions seem to run counter to the idea that the Fourth Circuit would create a firm boundary beyond which underperformance could not plausibly give rise to a duty to intervene."); *Fezer v. Lockheed Martin Corp.*, 2026 WL 1041276, at *6-7 (D. Md. Apr. 16, 2026) (declining to "impose[] any such categorical rule" and refusing to dismiss "on the basis that the quantification of the underperformance is necessarily too low"); *see also Payne v. Hormel Foods Corp.*, No. 24-CV-545 (SRN/DTS), 2024 WL 4228613, at *2, 8 (D. Minn. Sept. 18, 2024) (denying motion to dismiss where the plaintiff "allege[d] that the GIC at issue received a lower crediting rate than a comparable fund of the same structure over a period of six years;" for one comparator "by a rate of 0.71% to 1.58%" and for another comparator "by a rate of 1.25% to 4.00%").

Defendants' percentage-point framing also obscures the shortfall's scale relative to the returns the AC TDFs actually delivered. Even under Defendants' own post-2019 calculations, American Funds' three-year return at the 2030 vintage was approximately 59% greater than the AC TDFs' return—4.11% compared with 2.58%—and its five-year return was approximately 53% greater—4.77% compared with 3.11%. ECF No. 13-5 at 2. A performance gap of that relative magnitude, repeated across vintages and compounded over a participant's working life, cannot be dismissed as merely "modest" underperformance.

In any event, the Complaint does not rest on any single percentage-point spread. It alleges a pattern "consistently observable across both metrics and time": the AC TDFs trailed in 512 of

28

534 comparisons. That pervasive and sustained pattern supports an inference of imprudence even if any one return differential, viewed in isolation, might not. *Kistler*, 2024 WL 3292543, at *12 (a claim survives even where plaintiffs do not allege "underperformance that is substantial enough alone" so long as the shortfall "should have at the very least captured the attention of a prudent fiduciary").

*Dawson v. Brookfield Asset Mgmt. LLC*, 2026 WL 835553 (N.D. Ohio Mar. 26, 2026), which Defendants invoke for magnitude, does not require a different result. The court held the plaintiff's peer target-date suite comparators "adequate comparators," and assumed the large-suite comparators adequate as well. *Id.* at *17, *19. The court dismissed on magnitude alone. The pleaded spreads ran generally one to three percentage points and "never exceed[ed] 4%" over the three- and five-year periods—too modest, the court held, to infer imprudence—and the plaintiff's larger figures surfaced only in "four nonconsecutive years" of single-year returns: "[s]uch a small window of time cannot plausibly establish imprudence." *Id.* at *18. That reasoning does not reach this Complaint, for three reasons.

First, *Dawson* applied a magnitude-of-underperformance requirement rooted in *Smith v. CommonSpirit Health* and developed by its progeny—the rule that a shortfall must be "substantial" and not merely "one, two or even three percentage points" before imprudence may be inferred. *Dawson*, 2026 WL 835553, at *18-19; *see Smith*, 37 F.4th at 1166-67. The Eighth Circuit has adopted no such threshold; it screens prudence claims through the meaningful benchmark requirement and a process inquiry, asking only for circumstantial facts supporting a plausible inference of a flawed process. *Matousek*, 51 F.4th at 278, 281; *Davis*, 960 F.3d at 482-83; *Braden*, 588 F.3d at 595-98.

29

Second, the underperformance theory *Dawson* credited rose and fell on raw-return spreads. Here, raw returns are two of thirteen metrics, and the pleaded risk-adjusted, benchmark-relative, and efficiency measures—Sharpe, Sortino, Alpha, the Information Ratio, batting average, and turnover—answer the "modest-magnitude" and "different-strategy" deflection on which *Dawson* turned, because they measure more than the size of a spread. Compl. ¶¶ 53-54, 67.

Third, the *Dawson* plaintiff did not respond to the defendants' arguments concerning underperformance. 2026 WL 835553, at *11. Plaintiffs address that argument head-on, and plead a continuous, multi-vintage, thirteen-metric pattern, the concentration of three-quarters of Plan assets in the defaulted suite, and quarterly reviews the Fiduciaries let pass without acting. Compl. ¶¶ 67-68, 87, 93.

Defendants' other magnitude authorities collapse on inspection as well. For example, *Batt v. 3M Co.* dismissed for want of a pleaded benchmark for the custom, BlackRock-LifePath-modeled 3M funds, while expressly crediting the plaintiffs' metrics—"[h]ad Plaintiffs plausibly alleged a meaningful benchmark, their alleged performance metrics plausibly show it was imprudent" to retain the funds. No. 25-CV-3149 (ECT/DTS), 2026 WL 674322, at *2, *7 (D. Minn. Mar. 10, 2026). *Batt* thus credits the very inference Defendants resist, and it concerned custom 3M portfolios, wholly unlike the AC TDFs. *Nolan v. Sonic Automotive, Inc.* is not a target-date case at all: its 7.03% figure described an actively managed value fund measured against the S&P 500 index, and the court addressed it only arguendo. No. 3:25-CV-00474-KDB-WCM, 2026 WL 1195596, at *8 (W.D.N.C. May 1, 2026). If anything, *Nolan* helps Plaintiffs—it shows that courts scrutinize comparator fit, and four market-leading target-date suites are far closer in kind to the AC TDFs than a stock index is to a value fund.

*Patterson v. Morgan Stanley* held only that fiduciaries need not "reflexively jettison" investments to chase the prior year's top performers, No. 16-CV-6568 (RJS), 2019 WL 4934834, at *11 (S.D.N.Y. Oct. 7, 2019)—a duty Plaintiffs do not assert. The claim here is failure to act on six years of across-the-board underperformance through quarterly reviews, Compl. ¶¶ 67, 93. Last, *Jones* and *Abel* likewise turned on isolated raw-return spreads. *Jones v. DISH Network Corp.*, No. 22-CV-00167-CMA-STV, 2023 WL 2644081, at *7 (D. Colo. Mar. 27, 2023) (1%–3.5% over three and five years); *Abel v. CMFG Life Ins. Co.*, No. 22-CV-449-WMC, 2024 WL 307489, at *5 (W.D. Wis. Jan. 26, 2024) (0.2%–5%, average 1–3%). Neither confronted a complaint pleading eleven risk-adjusted and efficiency metrics, a suite holding three-quarters of plan assets, and a manager's own abandoned benchmark. None states a rule the Eighth Circuit recognizes, and none reaches this Complaint.

## B. Repeated underperformance over three- and five-year periods is sufficient; no ten-year minimum applies.

Defendants' description of the Complaint as relying on "two arbitrary snapshots," MTD at 11, mistakes measurement dates for measurement periods. The Complaint evaluates three- and five-year trailing returns, each of which captures performance over multiple years, and alleges that by the end of 2019 the AC TDFs had "consistently underperformed for 6 years . . . across all metrics." Compl. ¶ 67. The pleaded underperformance therefore is neither momentary nor confined to two isolated dates.

No authority requires a plaintiff to plead ten years of underperformance before challenging a fiduciary's continued retention of a fund. *Hughes* requires a context-specific inquiry into the circumstances alleged. 595 U.S. at 177. Courts accordingly reject the argument that comparable periods are categorically too short. *Payne v. Hormel Foods Corp.* declined to hold a six-year period insufficient to infer a flawed process. 2024 WL 4228613, at *2, *6 (D. Minn. Sept. 18, 2024). Six

31

years is the period alleged here: on rolling three- and five-year lookbacks reaching back to 2013, the AC TDFs "consistently underperformed for 6 years . . . across all metrics" by the end of 2019. Compl. ¶¶ 67-68 & n.12. *Smith* itself recognized underperformance "may offer a building block for a claim of imprudence," 37 F.4th at 1167, and that "sufficiently dismal performance" combined with "allegations about [a fiduciary's] methods" states a claim, *id.* at 1168—both of which this Complaint supplies.

What controls is not the count of measurement dates but their reach. A three- or five-year trailing return is itself a multi-year measure, so a grid of such returns pleads underperformance sustained over years, not frozen at an instant. *See, e.g.*, *Johnson v. Parker-Hannifin Corp.*, 122 F.4th 205, 215-16 (6th Cir. 2024) (accepting that prudent fiduciaries assess trailing three-year performance); *Trauernicht v. Genworth Fin. Inc.*, No. 3:22CV532, 2023 WL 5961651, at *12 (E.D. Va. Sept. 13, 2023) (where a complaint alleges challenged TDFs "failed to generate favorable returns for eight consecutive three-year and five-year periods," an argument that underperformance is too brief "lacks merit"); *Thomson v. Caesars Holdings Inc.*, 661 F. Supp. 3d 1043, 1058 (D. Nev. 2023) (crediting three- and five-year underperformance together with continued retention); *Binder v. PPL Corp.*, 2024 WL 1096819, at *3-4 (E.D. Pa. Mar. 12, 2024) (sustaining an imprudent-retention claim on three-year trailing underperformance and continued retention over multiple years); *Fulton v. FCA US LLC*, No. 24-CV-13159, 2025 WL 2800003, at *8 (E.D. Mich. Sept. 30, 2025) ("whether three-to-five-year metrics are appropriate in this context are best left to resolution on the facts, not law"); *Sellers v. Trs. of Boston Coll.*, 647 F. Supp. 3d 14, 32 (D. Mass. 2022) (rejecting argument against one-, three-, and five-year data; denying motion to dismiss).

Defendants' ten-year benchmark fares no better. From *Wildman* and *Batt*, Defendants distill a rule that only "'consistent, ten-year underperformance' that is 'substantial'" can state a claim.

MTD at 13 (quoting *Batt*, 2026 WL 674322, at *7, and *Wildman v. Am. Century Servs., LLC*, 362 F. Supp. 3d 685, 707 (W.D. Mo. 2019)). But *Wildman* sets no pleading floor. It followed a bench trial on a full evidentiary record, and its observation that a fiduciary "may—and often does—retain investments through a period of underperformance," *id.* at 707, describes what the trial evidence showed, not what a complaint must allege. That post-trial finding is not a ten-year pleading requirement, and *Hughes*'s context-specific inquiry forecloses one. 595 U.S. at 177. The duration question is whether the Complaint pleads sustained, not momentary, underperformance. It does.

Finally, dismissal with prejudice as Defendants request, MTD at 17, would be unwarranted even under Defendants' own authorities. *Batt*, the magnitude case on which Defendants rely, dismissed without prejudice and permitted amendment. 2026 WL 674322, at *8-9 (plaintiffs have since filed an amended complaint, ECF No. 53, and Defendants' renewed motion to dismiss is pending). Defendants' broader assertion that courts "routinely reject" comparable claims likewise overstates the cited authority: among their cases, only *Dawson* and *Phillips* dismissed claims involving the AC TDFs, and *Phillips* did so only after repeated amendments. Thus, even if the Court identifies a pleading deficiency, it should grant Plaintiffs leave to amend.

## IV. Count II survives because Count I survives, and the Company's appointment-and-monitoring duties are independently pleaded.

Defendants relegate Count II to a single footnote, arguing only that the failure-to-monitor claim is derivative and falls with Count I. MTD at 16 n.11. That argument defeats itself: because Count I survives, Count II survives with it. *See Doll*, 2025 WL 4042583, at *4 ("Because Plaintiffs' breach of duty of prudence claim survives, and Plaintiffs sufficiently pled a failure to monitor claim, the Court denies Defendants' motion to dismiss Count II."); *McGeathy*, 2026 WL 617343, at *3 (same).

Count II also stands on its own pleaded elements. The claim runs against the Company, which "had the authority to appoint and remove members or individuals responsible for Plan investment management" and "was aware that these fiduciaries had critical responsibilities for the Plan." Compl. ¶ 138. With that appointing authority came a duty to monitor those individuals—to ensure they were qualified, adequately informed, and performing their fiduciary obligations, and to act if they were not. *Id.* ¶¶ 139-140; *see Tibble*, 575 U.S. at 530 (the duty to monitor and remove is continuing). The Complaint pleads that the Company breached that duty by failing to monitor or evaluate the individuals' performance, by failing to monitor the process by which the Plan's target-date options were evaluated, and by failing to remove fiduciaries who kept the imprudent AC TDFs in place. *Id.* ¶ 140(a)-(c). The Plan's extraordinary concentration in the AC TDFs—68% to 76% of all assets—only heightened the Company's duty to ensure the individuals it appointed were monitoring the Plan's most consequential holding. *Id.* ¶¶ 41, 138.

**CONCLUSION**

The Complaint plausibly alleges that the Fiduciaries retained the AC TDFs despite a persistent and readily observable pattern of underperformance. It identifies four specific, investable, market-leading Comparator Suites and explains why they provide the sound basis for comparison that *Matousek* requires. It measures the AC TDFs against those suites across thirteen metrics, multiple vintages, and successive three- and five-year periods; alleges that the shortfalls persisted through repeated quarterly reviews; and explains why the funds' supposedly conservative design does not account for their poor risk-adjusted and benchmark-relative performance. It further connects that longstanding pattern to the Class Period through ERISA's continuing duty to monitor and alleges resulting losses of $5.7 million to $11.9 million, depending on the comparator. Those allegations support a reasonable inference that the Fiduciaries' monitoring and retention process was imprudent. The derivative monitoring claim against the Company therefore survives as well.

34

Defendants' contrary position depends on resolving factual disputes in their favor. Their motion asks the Court to treat "to" and "through" labels as dispositive despite contrary allegations about the funds' actual allocations; elevate attorney-prepared return tables over the Complaint's broader comparative analysis; isolate two raw-return measures while disregarding the eleven additional measures that bear directly on their conservatism explanation; and impose categorical magnitude and duration requirements that neither the Eighth Circuit nor any controlling authority recognizes. Rule 12(b)(6) permits none of those steps. Because the Complaint supplies a sound basis for comparison and pleads facts supporting an inference of a flawed fiduciary process, the motion should be denied in its entirety. Should the Court find any allegation deficient, Plaintiffs respectfully request leave to amend.

DATED: June 29, 2026     Respectfully submitted,

          */s/ Ryan M. Tucker*
          Ryan M. Tucker*
          **MILBERG, PLLC**
          800 S. Gay St., Suite 1100
          Knoxville, TN 37929
          Tel: (865) 247-0080
          rtucker@milberg.com
          *Admitted pro hac vice*

          Josh Sanford
          Arkansas Bar No. 2001037
          **SANFORD LAW FIRM, PLLC**
          Kirkpatrick Plaza
          10800 Financial Centre Pkwy, Suite 510
          Little Rock, Arkansas 72211
          Telephone: (501) 221-0088
          josh@sanfordlawfirm.com

          *Counsel for Plaintiffs and the Putative Class*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on June 29, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Ryan M. Tucker*
