# Exhibit A

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**

| | |
|---|---|
| **DONALD B. HODGES, JOYCE R. KENDRICK, Individually and on behalf of the Washington Regional 401(k) Plan, and on behalf of all similarly situated participants and beneficiaries of the plan,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**WASHINGTON REGIONAL MEDICAL SYSTEM and the PENSION COMMITTEE,**<br><br>**Defendants.** | **Case No.: 5:26-cv-05070-TLB** |

**REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**
**PLAINTIFFS' CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

INTRODUCTION .......................................................................................................... 1

ARGUMENT.................................................................................................................. 2

    I.   The Court Can Consider Defendants' Appendices. ........................................... 2

    II.  Plaintiffs Fail to Establish Any Meaningful Benchmarks...................................... 5

    III. Even Assuming a Meaningful Benchmark, Plaintiffs Do Not Allege Material, Sustained Underperformance. ......................................................................... 10

CONCLUSION............................................................................................................. 14

# TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*Abel v. CMFG Life Ins. Co.*,
   No. 3:22-cv-00449, 2024 WL 307489 (W.D. Wisc. Jan. 26, 2024) .......................................... 8

*Al-Saadoon v. Barr*,
   973 F.3d 794 (8th Cir. 2020) .................................................................................................. 6

*Anderson v. Intel Corp. Inv. Pol'y Comm.*,
   137 F.4th 1015 (9th Cir. 2025) ................................................................................... 2, 7, 9, 10

*Anderson v. Intel Corp. Inv. Pol'y Comm.*,
   579 F. Supp. 3d 1133 (N.D. Cal. 2022) ................................................................................... 9

*Barrett v. O'Reilly Auto., Inc.*,
   112 F.4th 1135 (8th Cir. 2024)................................................................................................ 14

*Batt v. 3M Co.*,
   No. 0:25-cv-03149, 2026 WL 674322 (D. Minn. Mar. 10, 2026).................................... 1, 7, 11

*Binder v. PPL Corp.*,
   No. 5:22-cv-00133, 2024 WL 1096819 (E.D. Pa. Mar. 12, 2024) ........................................... 13

*BJC Health Sys. v. Columbia Cas. Co.*,
   348 F.3d 685 (8th Cir. 2003) .................................................................................................. 4

*Carter v. Sentara Healthcare Fid. Comm.*,
   No. 2:25-cv-00016, 2025 WL 2427614 (E.D. Va. Aug. 11, 2025)........................................... 13

*Davis v. Wash. Univ. in St. Louis*,
   960 F.3d 478 (8th Cir. 2020) ............................................................................................. 3, 12

*Dawson v. Brookfield Asset Mgmt. LLC*,
   No. 1:25-cv-00852, 2026 WL 835553 (N.D. Ohio Mar. 26, 2026)................................... 13, 14

*Doll v. Evergy, Inc.*,
   No. 4:25-cv-00043, 2025 WL 4042583 (W.D. Mo. Sept. 10, 2025)........................................ 6

*Elder v. Gillespie*,
   No. 3:19-cv-00155, 2020 WL 2813524 (E.D. Ark. May 29, 2020) ......................................... 3

*Fezer v. Lockheed Martin Corp.*,
   No. 8:25-cv-00908, 2026 WL 1041276 (D. Md. Apr. 16, 2026)......................................... 5, 13

*Fitzpatrick v. Neb. Methodist Health Sys., Inc.*,
   No. 8:23-cv-00027, 2023 WL 5105362 (D. Neb. Aug. 9, 2023).......................................... 5, 7

*Fulton v. FCA US LLC*,
   No. 24-cv-13159, 2025 WL 2800003 (E.D. Mich. Sept. 30, 2025) ........................................ 13

*Hall v. Cap. One Fin. Corp.*,
   No. 1:22-cv-00857, 2023 WL 2333304 (E.D. Va. Mar. 1, 2023)............................................. 7

*In re Quest Diagnostics ERISA Litig.*,
  No. 24-2866, 2026 WL 1783204 (3d Cir. June 22, 2026) ........................................... 10, 11, 12

*Johnson v. Parker-Hannifin Corp.*,
  122 F.4th 205 (6th Cir. 2024) ..................................................................................... 13

*Kistler v. Stanley Black & Decker, Inc.*,
  No. 3:22-cv-00966, 2024 WL 3292543 (D. Conn. July 3, 2024) ............................... 13

*Luckett v. Wintrust Fin. Corp.*,
  No. 1:22-cv-03968, 2024 WL 3823175 (N.D. Ill. Aug. 14, 2024) ............................. 10

*Matney v. Barrick Gold of N. Am.*,
  80 F.4th 1136 (10th Cir. 2023) ..................................................................................... 3

*Matousek v. MidAm. Energy Co.*,
  51 F.4th 274 (8th Cir. 2022) .................................................................................. *passim*

*McGeathy v. Reinalt-Thomas Corp.*,
  No. 2:25-cv-01439, 2026 WL 617343 (D. Ariz. Mar. 5, 2026) .................................. 6, 7

*Meiners v. Wells Fargo & Co.*,
  898 F.3d 820 (8th Cir. 2018) ............................................................................. 3, 10, 12

*Miller v. Redwood Toxicology Lab'y, Inc.*,
  688 F.3d 928 (8th Cir. 2012) ....................................................................................... 3

*Payne v. Hormel Foods Corp.*,
  No. 0:24-cv-00545, 2024 WL 4228613 (D. Minn. Sept. 18, 2024) ........................... 13

*Phillips v. Cobham Advanced Elec. Sols., Inc.*,
  No. 5:23-cv-03785, 2025 WL 2689268 (N.D. Cal. Sept. 19, 2025) .............................. 5, 7, 8, 9

*Pizarro v. Home Depot, Inc.*,
  111 F.4th 1165 (11th Cir. 2024) ............................................................................ 10, 12

*Renfro v. Unisys Corp.*,
  671 F.3d 314 (3d Cir. 2011) .......................................................................................... 3

*Rubke v. ServiceNow, Inc.*,
  No. 3:24-cv-01050 (N.D. Cal. Apr. 22, 2025) ............................................................. 6

*Ruebel v. Tyson Foods, Inc.*,
  No. 5:23-cv-05216, 2024 WL 3682230 (W.D. Ark. Aug. 6, 2024) ............................. 4

*Sellers v. Trs. of Boston Coll.*,
  647 F. Supp. 3d 14 (D. Mass. 2022) ............................................................................ 13

*Smith v. CommonSpirit Health*,
  37 F.4th 1160 (6th Cir. 2022) ............................................................................... *passim*

*Snyder v. UnitedHealth Grp., Inc.*,
  No. 0:21-cv-01049, 2021 WL 5745852 (D. Minn. Dec. 2, 2021) ............................... 7

*Thomson v. Caesars Holdings Inc.*,
  661 F. Supp. 3d 1043 (D. Nev. 2023) .......................................................................... 13

iii

*Trauernicht v. Genworth Fin. Inc.*,
   No. 3:22-cv-00532, 2023 WL 5961651 (E.D. Va. Sept. 13, 2023) ............................................ 13

*White v. Chevron Corp.*,
   No. 16-cv-00793, 2016 WL 4502808 (N.D. Cal. Aug. 29, 2016)............................................ 11

*Wildman v. Am. Century Servs., LLC*,
   362 F. Supp. 3d 685 (W.D. Mo. 2019) ...................................................................... 11

*Winston v. City of St. Louis*,
   No. 4:24-cv-01390, 2026 WL 497057 (E.D. Mo. Feb. 23, 2026)............................................ 5

*Zean v. Fairview Health Servs.*,
   858 F.3d 520 (8th Cir. 2017) ............................................................................ 3

iv

**INTRODUCTION**

Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss (Dkt. 18) ("Opposition") largely ignores binding Eighth Circuit precedent and undisputable facts; this Court should not. To "nudge" their claim that the American Century TDFs underperformed "from possible to plausible," Plaintiffs must provide "a sound basis for comparison—a meaningful benchmark." *Matousek v. MidAm. Energy Co.*, 51 F.4th 274, 278 (8th Cir. 2022).[1] They claim that selecting four TDFs based on market prominence and then comparing them to the American Century TDFs using risk-adjusted performance metrics is sufficient to clear this hurdle, Opp. at 3, despite key differences in asset allocation, glide path, investment strategy, and risk profile. Mot. at 6. The Eighth Circuit disagrees: a "meaningful benchmark" means a comparison to "peer-group funds" that "hold similar securities, have similar investment strategies, and reflect a similar risk profile" as the American Century TDFs. *Matousek*, 51 F.4th at 281. This failure alone warrants dismissal.

Plaintiffs also needed to allege sustained, material underperformance—"'consistent, ten-year underperformance' that is 'substantial.'" *Batt v. 3M Co.*, No. 0:25-cv-03149, 2026 WL 674322, at *7 (D. Minn. Mar. 10, 2026). While they claim that there is no such requirement, Opp. at 3, the majority of district courts across the country reject the "underperformance" alleged here—no more than 3.04%, and often far less, during a two-year period—as insufficient to state an imprudence claim as a matter of law. Mot. at 11-15. The cases cited by Plaintiffs in support of their position are mischaracterized or from jurisdictions that defer such questions until summary judgment (unlike the Eighth Circuit)—or both. This too requires dismissal.

---

[1] Capitalized terms not otherwise defined herein have the same meanings as in the Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiffs' Class Action Complaint (Dkt. 13-1) ("Motion").

Plaintiffs' various risk-adjusted performance metrics, Opp. at 1-2, do not save their claim. As the Ninth Circuit recognized last year, "an ERISA plaintiff cannot make incomparable funds comparable simply by using a ratio" to risk-adjust performance returns in lieu of a meaningful benchmark. *Anderson v. Intel Corp. Inv. Pol'y Comm.*, 137 F.4th 1015, 1025 (9th Cir. 2025). But even if these metrics were relevant, they still do not support a plausible inference of imprudence here. Plaintiffs' own comparator, the BlackRock TDFs, performed almost identically to the American Century TDFs on these metrics relative to the other Comparator TDFs. *Compare* App. E (showing that, based on Plaintiffs' own data, the BlackRock TDFs underperformed the remaining Comparator TDFs in 470 out of 514 (91.4%) comparisons), *with* Compl. ¶ 68 (alleging that the American Century TDFs underperformed the Comparator TDFs in 512 out of 534 (95.9%) comparisons).

At bottom, Plaintiffs' arguments change nothing. The fact remains that the Complaint does not identify a meaningful benchmark or sustained, material underperformance—the Eighth Circuit requires both. Plaintiffs' claims should be dismissed in full with prejudice.

## **ARGUMENT**

### I.    **The Court Can Consider Defendants' Appendices.**

Plaintiffs claim that the Court cannot consider Defendants' Appendices because they are "fresh compilations of third-party Morningstar data" that "are not attached to, incorporated in, or necessarily embraced by the Complaint." Opp. at 19. Not so:

- Appendix A (Dkt. 13-3) contains performance data from Appendix A to the Complaint (Dkt. 2-1) that is simply presented more conveniently for comparison;

- Appendix B (Dkt. 13-4) contains asset allocation data for quarter one 2020 that is publicly accessible via Morningstar. Plaintiffs allege that asset allocation is one of the "most critical criteria for selecting and retaining" TDFs, Compl. ¶ 50, and the Complaint discusses asset allocation generally and with respect to the American Century TDFs, *id.* ¶¶ 28-37; and

- Appendices C and D (Dkts. 13-5, 13-6) contain performance data for quarter one 2020 and

year-end 2022 that is publicly accessible via Morningstar. Plaintiffs necessarily relied on the same performance data in alleging that the American Century TDFs were "demonstrably underperforming and imprudent . . . from 2020 through 2024." Compl. ¶ 75; *see also id.* ¶ 65 ("[F]or several years prior to **and continuing throughout the Class Period**, the [American Century] TDF has consistently underperformed other target date series options . . . ." (emphasis added)), ¶ 68 (alleging that the Plan suffered losses due to the American Century TDFs' underperformance from January 2020 through December 2024).

The Court may consider these Appendices because they are "necessarily embraced by the complaint," *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017). Specifically, they contain information that is "incorporated by reference or integral to the claim," "subject to judicial notice," and/or a "matter[] of public record." *Miller v. Redwood Toxicology Lab'y, Inc.*, 688 F.3d 928, 931 n.3 (8th Cir. 2012). It was for these exact reasons that the Sixth Circuit endorsed the use of "more recent [Morningstar performance] data" at the motion to dismiss stage in *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1168 (6th Cir. 2022)—a decision that the Eighth Circuit later cited favorably. *See Matousek*, 51 F.4th at 280 (citing *Smith*, 37 F.4th at 1169).

The Eighth Circuit and other circuit courts have likewise endorsed the use of documents containing similar information in affirming the dismissal of investment challenges. *See, e.g.*, *Davis v. Wash. Univ. in St. Louis*, 960 F.3d 478, 486 (8th Cir. 2020) (relying on prospectuses "embraced by the pleadings" to identify fund investment strategies and underlying holdings); *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 823 (8th Cir. 2018) (approving of district court's use of prospectuses "embraced by the pleadings" to determine that comparator fund "was not a meaningful benchmark"); *Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1150 n.11 (10th Cir. 2023) (district court properly considered, among other things, fund summary prospectuses, fund prospectuses, and industry surveys in dismissal order); *Renfro v. Unisys Corp.*, 671 F.3d 314, 319 (3d Cir. 2011) (district court properly considered fund prospectuses in granting motion to dismiss).

The reason why is simple: "to prevent gaming" of the sort Plaintiffs engage in here. *Elder v. Gillespie*, No. 3:19-cv-00155, 2020 WL 2813524, at *4 (E.D. Ark. May 29, 2020) (citing *BJC*

3

*Health Sys. v. Columbia Cas. Co.*, 348 F.3d 685, 687 (8th Cir. 2003) ("[A] plaintiff may not avoid an otherwise proper motion to dismiss by failing to attach to the complaint documents upon which it relies.")). The Complaint alleges that the American Century TDFs were included in the Plan from "2016 through at least the end of 2024" despite underperforming "for several years prior to and continuing throughout the Class Period." Compl. ¶¶ 62, 65. Plaintiffs could have provided the Court with readily available performance data from 2016 through 2024 to support their claim. Instead, they cherry-picked select returns and risk-adjusted performance metrics for just two of these nine years—with the benefit of hindsight—to manufacture a theory of underperformance that is belied by the very performance data they omitted. Mot. at 13-14. Plaintiffs cannot evade dismissal by simply hiding the ball from the Court—particularly when there is no dispute about the accuracy of the asset allocation and performance data contained in Appendices B, C, and D.[2]

The three cases cited by Plaintiffs do not suggest otherwise. Opp. at 20-22. The Opposition tries to distinguish this Court's consideration of a similar chart prepared by the defendant in *Ruebel v. Tyson Foods, Inc.*, No. 5:23-cv-05216, 2024 WL 3682230, at *4 n.4 (W.D. Ark. Aug. 6, 2024) as turning on "three reasons absent here." Opp. at 20. Not so. Just like the chart in *Ruebel*, Appendices B, C, and D rely on data: (i) from a publicly accessible source that is necessarily embraced by the Complaint; (ii) comparable to information found in other documents that the Eighth Circuit has endorsed at the pleading stage; and (iii) whose accuracy is undisputed. *See supra* at pp. 2-4.

True, the court in *Phillips v. Cobham Advanced Elec. Sols., Inc.* did not take judicial notice of exhibits offered for the "primary purpose" of contradicting certain allegations. No. 5:23-cv-03785, 2025 WL 2689268, at *3 (N.D. Cal. Sept. 19, 2025). But there is nothing to contradict

---

[2] The Opposition argues that "Plaintiffs do not concede their accuracy" because "they dispute the inference Defendants draw from them," Opp. at 20, but nowhere do Plaintiffs suggest that the data itself is inaccurate.

here—the Complaint omits asset allocation and performance data (from 2020 onward) for the American Century and Comparator TDFs. But even if there were "clear inconsistencies" between the Complaint and Appendices, "the document[s] control[]" where, as here, they are "embraced by the Complaint." *Winston v. City of St. Louis*, No. 4:24-cv-01390, 2026 WL 497057, at *6 n.3 (E.D. Mo. Feb. 23, 2026) (citation modified).

And the court in *Fezer v. Lockheed Martin Corp.* was not discussing this issue at all, but what was required to plead a meaningful benchmark. No. 8:25-cv-00908, 2026 WL 1041276, at *8 (D. Md. Apr. 16, 2026). While the court in *Fezer* believed a more "granular analysis" of the proffered alternatives was inappropriate at the motion-to-dismiss stage, *id.*, "the Eighth Circuit has set out a stringent examination[,] which includes a detailed look at the composition of comparator funds, including the type of assets, investment strategies, and risk profiles." *Fitzpatrick v. Neb. Methodist Health Sys., Inc.*, No. 8:23-cv-00027, 2023 WL 5105362, at *7 (D. Neb. Aug. 9, 2023). Plaintiffs' repeated pleas for the court to defer judicial scrutiny of their comparators until summary judgment, *see, e.g.*, Opp. at 12, 16 & 21-22, thus fall flat.

Accordingly, the Court can and should consider Defendants' Appendices at this stage.

## II.      Plaintiffs Fail to Establish Any Meaningful Benchmarks.

Plaintiffs' imprudence claim fails because they do not plead a meaningful benchmark, as the Eighth Circuit requires. The Complaint simply says nothing about whether the Comparator TDFs "hold similar securities, have similar strategies, and reflect a similar risk profile" as the American Century TDFs." *Matousek*, 51 F.4th at 281. Absent such facts, there is no "sound basis for comparison." *Id.*; *see also* Mot. at 9-11. Plaintiffs' arguments to the contrary are unavailing.

***First***, they claim that multiple courts "applying the meaningful-benchmark standard to this very [American Century] TDF suite have denied dismissal." Opp. at 7. Plaintiffs are wrong. In two of the three cases they cite, *Doll* and *Rubke*, the courts actually held that a meaningful benchmark

was **not** required to infer imprudence because the plaintiffs made "significant" and "direct" allegations about the fiduciaries' decision-making processes. *Doll v. Evergy, Inc.*, No. 4:25-cv-00043, 2025 WL 4042583, at *3 (W.D. Mo. Sept. 10, 2025) ("The Court agrees with Plaintiffs that significant allegations of wrongdoing eliminate the need to infer a fiduciary breach through use of meaningful benchmarks."); *Rubke v. ServiceNow, Inc.*, No. 3:24-cv-01050 (N.D. Cal. Apr. 22, 2025), Dkt. 90 at 8 (denying motion to dismiss, as the plaintiffs made "direct allegations of process errors" such that the court did not need a meaningful benchmark to infer imprudence). These allegations included that the fiduciaries did not follow their investment policy statements, failed to assess whether the American Century TDFs were appropriate for their plans, and "uncritically relied on" their investment advisor or, alternatively, ignored "multiple red flags" raised by their investment advisor. *Doll*, 2025 WL 4042583, at *3; *Rubke*, Dkt. 90 at 2-3. There are no such allegations here.[3]

While the court in *McGeathy v. Reinalt-Thomas Corp.*, No. 2:25-cv-01439, 2026 WL 617343 (D. Ariz. Mar. 5, 2026) held that the plaintiff's comparators were meaningful benchmarks for the American Century TDFs, that case only confirms that Plaintiffs' allegations are inadequate. The plaintiff in *McGeathy* provided the following facts about the American Century TDFs and his comparators: (i) investment "aim"; (ii) "potential rewards"; (iii) "potential risks" and "risk level"; (iv) "glide path"; and (v) "the types of investments they engage in." *Id.* at *3. By comparison,

---

[3] Plaintiffs claim that they "plead[] the same kind of failure to act on repeated warning signs," Opp. at 9, but it is unclear what they are referencing. The Complaint contains zero allegations about Defendants' decision-making process—for example, how often the Committee met, what materials the Committee reviewed and discussed at such meetings, and why the Committee retained the American Century TDFs in the Plan. This is unsurprising given that Plaintiffs later admit that they "have never seen" the "contents of [C]ommittee minutes" or any other documents related to Defendants' management of the Plan. Opp. at 24. The Court should disregard the Opposition's invocation of "facts" that the Complaint does not—and cannot—allege, *see, e.g.*, *id.* at 1, 3 & 25, as "[i]t is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss." *Al-Saadoon v. Barr*, 973 F.3d 794, 804-05 (8th Cir. 2020).

Plaintiffs allege only that the American Century TDFs use a "to" glide path—the rest is a mystery. The reason why is simple. The American Century and Comparator TDFs have "fundamentally different investment strategies and risk preferences," *Phillips*, 2025 WL 2689268, at *2, *5-7, including in asset allocation, glide path, and use of active or passive underlying funds. Mot. at 6.[4]

**Second**, Plaintiffs say that the Complaint's risk-adjusted performance metrics "neutralize[]" these key differences by "hold[ing] risk constant and absorb[ing] . . . allocation and glidepath differences," providing "the like-for-like comparison the law requires." Opp. at 12. Their own authority says otherwise. Just last year, the Ninth Circuit affirmed the grant of a motion to dismiss with prejudice, holding that "an ERISA plaintiff cannot make incomparable funds comparable simply by using a ratio" to risk-adjust performance returns. *Anderson*, 137 F.4th at 1025. The Ninth Circuit reasoned that such metrics (like the ones Plaintiffs point to here) do not resolve the underlying problem—an improper performance comparison between dissimilar funds (like TDFs with core structural differences). *Id.* Rather, such metrics "only speculate[] that if a fund with a comparable risk profile had followed the trend of other, presumably riskier, funds, it would have generated higher returns," rather than actually identifying comparable alternative funds in the marketplace. *Id.*; *see also Hall v. Cap. One Fin. Corp.*, No. 1:22-cv-00857, 2023 WL 2333304, at *7 (E.D. Va. Mar. 1, 2023) (agreeing that risk-adjusted performance metrics "are not magic wands that equalize any two investments as meaningful benchmarks in the first place"). Accordingly, Plaintiffs' scattershot of metrices do not save their claim from dismissal.[5]

---

[4] Plaintiffs' reliance on *Snyder v. UnitedHealth Grp., Inc.*, No. 0:21-cv-01049, 2021 WL 5745852 (D. Minn. Dec. 2, 2021), Opp. at 9, is misplaced—it was "decided before the Eighth Circuit's decision in *Matousek*[,] which provides a more-detailed analysis." *Fitzpatrick*, 2023 WL 5105362, at *7 n.8; *see also Batt*, 2026 WL 674322, at *5 ("*Snyder* predates *Matousek* and therefore (understandably) does not engage in the composition-based comparison *Matousek* requires.").

[5] Plaintiffs also suggest that market prominence is a substitute for a meaningful benchmark, *see, e.g.*, Opp. at 6-7, but they cite not one case in support. For good reason. "Several courts have found

Plaintiffs relatedly claim that the American Century TDFs are not conservative because "[a] genuinely conservative fund that was prudently managed would post competitive risk-adjusted returns." Opp. at 2. This argument is nonsensical. After-the-fact performance returns (risk-adjusted or not) say nothing about a TDFs' intended investment strategy—it is asset allocation over time that matters. As the Complaint recognizes, a lower allocation to equities and higher allocation to bonds means less risk and an investment strategy "more focused on preservation" than "growth," and vice versa. Compl. ¶ 33. Not only do the American Century and Comparator TDFs have materially different asset allocations for the *four decades* predating retirement, but the American Century TDFs have the lowest allocation to equities and highest allocation to bonds for *every vintage* other than one. *See* App. B (Dkt. 13-4). As the Northern District of California recognized, these differences in asset allocation "reflect fundamentally different investment strategies and risk preferences," i.e., the American Century TDFs have a "more conservative [asset] allocation." *Phillips*, 2025 WL 2689268, at *6-7.

*Third*, Plaintiffs argue that the core structural differences between the American Century and Comparator TDFs do not matter because "American Century itself benchmarked the [American Century] TDFs against the American Funds [TDFs]." Opp. at 9. This characterization is entirely out of context. American Century contrasts the American Century TDFs with an "aggressive competitor"—historically, the American Funds TDFs—to illustrate how the American Century TDFs' conservative, risk-conscious investment strategy holds up versus TDFs with aggressive, equity-heavy investment strategies over a full market cycle (i.e., both upward and downward mar-

---

this very allegation insufficient." *Abel v. CMFG Life Ins. Co.*, No. 3:22-cv-00449, 2024 WL 307489, at *5 (W.D. Wisc. Jan. 26, 2024).

8

kets). The source cited in the Complaint (¶ 65 n.11) not only confirms that there are material differences between the two, but they also render Plaintiffs' claim of underperformance implausible. It shows that the American Century TDFs outperformed the American Funds TDFs—Plaintiffs' best-performing comparator in 2018 and 2019—from November 1, 2007 through June 30, 2024 based on actual *and* risk-adjusted returns while taking less risk *and* capturing less downside (i.e., losses during market downturns). Ex. 7, One Choice® Target Date Portfolios at 8-9.[6]

*Fourth*, Plaintiffs' efforts to distinguish holdings that dismissed (or affirmed the dismissal of) similar claims for lack of a meaningful benchmark, Opp. at 9-14, miss the mark. Those cases were not dismissed simply because "the plaintiffs never supplied the explanation" of "why the proposed comparators furnish a sound basis for comparison." *Id.* at 10. The problem was that the complaints were either: (i) "missing details" about whether the comparators "hold similar securities, have similar investment strategies, and reflect a similar risk profile" as the challenged funds, *Matousek*, 51 F.4th at 281—just like the Complaint here; or (ii) the complaints' allegations established that the comparators did not "hold similar securities, have similar investment strategies, and reflect a similar risk profile" as the challenged funds, *Matousek*, 51 F.4th at 281—just as Defendants established here. Mot. at 6.

Plaintiffs also misrepresent many of these cases. For example, they claim that *Smith* "involved a different comparison" than the one here. Opp. at 11. But the Sixth Circuit rejected the

---

[6] Plaintiffs also suggest that dissimilarities between the American Century and Comparator TDFs do not matter because they "share the same retirement-allocation purpose," "glide-path structure," "product category," and "investment purpose." Opp. at 11-12. But these "goals and features are common to *all* TDFs"—"[t]he argument that all TDFs are meaningful benchmarks cannot survive a motion to dismiss." *Anderson v. Intel Corp. Inv. Pol'y Comm.*, 579 F. Supp. 3d 1133, 1150 (N.D. Cal. 2022) (emphasis added), *aff'd*, 137 F.4th 1015 (9th Cir. 2025); *see also Phillips*, 2025 WL 2689268, at *6 (rejecting "insufficient allegations" that comparators for the American Century TDFs were "meaningful benchmarks" based on "features [] common to most, if not all, [TDFs]").

same "apples and oranges" comparison between actively and passively managed TDFs that Plaintiffs make here between the actively managed American Century TDFs and passively managed Vanguard and T. Rowe Price TDFs. *Smith*, 37 F.4th at 1166; Mot. at 6. Plaintiffs similarly suggest that the court's rejection of the plaintiff's comparators in *Luckett v. Wintrust Fin. Corp.* was unrelated to differences in "design, strategy, or risk" as compared to the challenged TDF. Opp. at 3. To the contrary, that was the very reason why the court rejected the plaintiff's "apples to oranges" comparisons between TDFs with different glide paths (to versus through) and investment strategies (active versus passive): "they have 'different aims, different risks, and different potential rewards . . . .'" *Luckett v. Wintrust Fin. Corp.*, No. 1:22-cv-03968, 2024 WL 3823175, at *3-4 (N.D. Ill. Aug. 14, 2024). The same is true here—none of the Comparator TDFs have the same glide path and investment strategy as the American Century TDFs, and thus, comparing them says nothing about prudence. *Meiners*, 898 F.3d at 823; Mot. at 6.[7]

In sum, Plaintiffs fail at step one: they do not provide a "sound basis for comparison—a meaningful benchmark." *Matousek*, 51 F.4th at 280. Their imprudence claim must be dismissed.

### III.    Even Assuming a Meaningful Benchmark, Plaintiffs Do Not Allege Material, Sustained Underperformance.

Plaintiffs' imprudence claim fails for an independent reason: they do not plead sustained, material underperformance. The Complaint instead alleges only that the American Century TDFs underperformed the Comparator TDF by 3.04% at most—and often far less—during two brief snapshots in time before the proposed class period. This is insufficient as a matter of law to support a plausible inference of imprudence. Mot. at 11-15. Plaintiffs' arguments to the contrary fail.

---

[7] While Plaintiffs claim otherwise, Opp. at 9, it is black-letter law that TDFs with different asset allocations, glide paths, investment strategies, and risk profiles are simply not comparable. *See, e.g.*, *In re Quest Diagnostics ERISA Litig.*, No. 24-2866, 2026 WL 1783204, at *4 (3d Cir. June 22, 2026); *Anderson*, 137 F.4th at 1024; *Pizarro v. Home Depot, Inc.*, 111 F.4th 1165, 1180 (11th Cir. 2024); *Smith*, 37 F.4th at 1167; *Meiners*, 898 F.3d at 823-25.

*First*, they claim that "[e]ven a one percentage point shortfall is not trivial." Opp. at 27. But the Department of Labor resource Plaintiffs point to refers to the importance of monitoring 401(k) plan fees and expenses, ***not*** performance returns. Ex. 8, A Look at 401(k) Plan Fees, at 5. It is black-letter law that "disappointing short-term losses" do not require fiduciaries to "[p]recipitously sell[] a well-constructed portfolio." *Smith*, 37 F.4th at 1166. Rather, "a fiduciary may – and often does – retain investments through a period of underperformance as part of a long-range investment strategy." *Wildman v. Am. Century Servs., LLC*, 362 F. Supp. 3d 685, 707 (W.D. Mo. 2019).[8] That is why only sustained, material underperformance—"'consistent, ten-year underperformance' that is 'substantial'"—can support a plausible imprudence claim. *Batt*, 2026 WL 674322, at *7. As the Third Circuit explained just two weeks ago, fiduciaries would otherwise be required "to cut every below-average fund" to chase returns, "creat[ing] chaos." *In re Quest*, 2026 WL 1783204, at *4 ("[m]inor underperformance" during two-year period "does not require immediate change"; only "severe and sustained" underperformance implicates imprudence).

*Second*, Plaintiffs argue that "the Complaint does not rest on raw returns," but "pleads thirteen metrics, eleven of which go beyond raw return." Opp. at 1; *see also id.* at 28-29. But no matter how many alternative metrices Plaintiffs aggregate into a pass/fail test, they do not solve for the fact that the alleged underperformance must be sustained and material to plausibly plead an imprudence claim. Mot. at 11-14. Indeed, Plaintiffs' attempt to distill prudence into a quantitative dashboard of metrics calculated over short periods is incompatible with "the fact-laden, judgement heavy nature of investment decisions"—which are not "a series of yes-or-no, up-or-

---

[8] While Plaintiffs try to distinguish *Wildman* as a trial decision, Opp. at 33, the court was quoting a decision granting a motion to dismiss: *White v. Chevron Corp.*, No. 16-cv-00793, 2016 WL 4502808, at *16 (N.D. Cal. Aug. 29, 2016).

down choices in a vacuum," *Pizarro*, 111 F.4th at 1176—and would lead to ill-advised performance chasing and "chaos." *In re Quest*, 2026 WL 1783204, at *4.

The arbitrary and flawed nature of Plaintiffs' comparison is best illustrated by their own comparator, the BlackRock TDFs, which the Complaint calls an "established industry leader[]" and "among the top five most selected options." Compl. ¶ 76. Comparing the BlackRock TDFs to the remaining Comparator TDFs using the same metrics and data in the Complaint and Appendix A thereto reveals that they "underperformed" in 470 out of 514 (91.4%) comparisons. *See* App. E. This is nearly identical to what Plaintiffs characterize as the American Century TDFs' "pervasive and sustained pattern . . . of imprudence." Opp. at 28. In other words, Plaintiffs ask this Court to infer imprudence from a test deeming one of their own comparators—an "established industry leader[]" and "among the top five most selected options," Compl. ¶ 76—equally as underperforming as the American Century TDFs.[9]

***Third***, Plaintiffs claim that the alleged underperformance—3.04% at most, and often far less—"cannot be dismissed as merely 'modest' underperformance" and that there are no "duration requirements" for underperformance. Opp. at 28, 35. The majority of courts disagree. Mot. at 12-15. The cases cited by Plaintiffs in support of their position do not dictate a different outcome. Many are from jurisdictions that defer such questions until summary judgment—unlike the Eighth Circuit—and thus, are irrelevant. Opp. at 27-32 (*Carter*, *Fezer*, *Trauernicht*, *Fulton*, *Kistler*,

---

[9] The Complaint also contains no facts from which the Court can determine whether a particular fund's results, as measured by Plaintiffs' metrics, indicate good, average, or bad performance such that the American Century TDFs' results in 2018 and 2019 "should have . . . captured the attention of a prudent fiduciary." Opp. at 29; *see* Compl. ¶¶ 53-54. Accordingly, the Court is left only with the allegation that the American Century TDFs "underperformed" just 4 of the 37 "established [TDF] series" on these metrics over a brief period before the proposed class period. Opp. at 4. This amounts to an argument that Defendants were required to pick the best-performing TDFs, which the Eighth Circuit has repeatedly rejected. *Davis*, 960 F.3d at 486; *Meiners*, 898 F.3d at 823.

*Sellers*). Others evaded dismissal because they had additional allegations not present here. *Id.* (*Payne*, *Kistler*, *Johnson*, *Binder*, *Thomson*, *Sellers*).

For example, the plaintiffs in *Kistler v. Stanley Black & Decker, Inc.*, No. 3:22-cv-00966, 2024 WL 3292543 (D. Conn. July 3, 2024) relied on three- and five-year trailing returns, but they also "present[ed] data showing relatively consistent underperformance from 2011 through at least 2021." *Id.* at *11. The plaintiff in *Payne v. Hormel Foods Corp.*, No. 0:24-cv-00545, 2024 WL 4228613, at *8 (D. Minn. Sept. 18, 2024) similarly alleged consistent underperformance from 2017 through 2023, plus the fact that the challenged fund "provided lower [returns] than [a] *safer* [fund] offered by the same insurer." *Id.* at *2, *8. By comparison, the Complaint here alleges just two years of immaterial underperformance as compared to entirely dissimilar funds.[10]

**Fourth**, Plaintiffs' attempts to distinguish *Dawson*, Opp. at 29-30, are inapt:

- The fact that the court in *Dawson* relied on the Sixth Circuit's seminal decision in *Smith*, Opp. at 29, only strengthens *Dawson*'s relevance here—as discussed above, the Eighth Circuit has cited *Smith* favorably. *See supra* at p. 3.

- The complaint in *Dawson* did not "r[i]se and f[a]ll on raw-return spreads." Opp. at 30. The plaintiff in *Dawson* also pointed to turnover ratio in challenging the American Century TDFs—just like here—which the court rejected. *Dawson v. Brookfield Asset Mgmt. LLC*, No. 1:25-cv-00852, 2026 WL 835553, at *19-20 (N.D. Ohio Mar. 26, 2026).

- Regardless of whether the plaintiff in *Dawson* addressed the defendants' underperformance arguments, Opp. 30, the court held that even greater underperformance than what is alleged here is insufficient as a matter of law to infer imprudence. *Dawson*, 2026 WL 835553, at *19.

---

[10] While Plaintiffs suggest that three- and five-year trailing returns for two years equates to "six years of across-the-board underperformance" because these are "multi-year measures," Opp. at 31-32, returns from quarter one 2020 show the flaw in their logic. For example, as of that date, the 2045 vintage of the American Century TDFs was outperforming the 2045 vintages of: (i) the T. Rowe Price TDFs based on three-year trailing returns; and (ii) the BlackRock and Vanguard TDFs based on three- and five-year trailing returns. *See* App. C (Dkt. 13-5) at 3. Under Plaintiffs' logic, this would mean the American Century TDFs (for this vintage) had outperformed the T. Rowe Price TDFs since quarter one 2017 and the BlackRock and Vanguard TDFs since quarter one 2015.

Accordingly, Plaintiffs fail at step two: they do not allege sustained, material underperformance. *Smith*, 37 F.4th at 1167. This too warrants dismissal of their imprudence claim.

## CONCLUSION

For the reasons stated above and in Defendants' Motion, the Court should dismiss Plaintiffs' claims in full with prejudice.[11]

Dated: July 6, 2026

Respectfully submitted,

*/s/ M. Caroline Wood*
William J. Delany (*pro hac vice*)
M. Caroline Wood (*pro hac vice*)
**GROOM LAW GROUP, CHARTERED**
1701 Pennsylvania Ave. NW
Suite 1200
Washington, DC 20006
Tel: (202) 861-6643
Fax: (202) 659-4503
wdelany@groom.com
cwood@groom.com

*Counsel for Defendants Washington Regional Medical System and the Pension Committee*

---

[11] A single paragraph in an opposition brief asking for leave to amend, Opp. at 33, is insufficient—particularly when Plaintiffs did not comply with Local Rule 5.5(e)'s requirements. *See Barrett v. O'Reilly Auto., Inc.*, 112 F.4th 1135, 1140-41 (8th Cir. 2024); *Matousek*, 51 F.4th at 282-83.

## CERTIFICATE OF SERVICE

I hereby certify that on July 6, 2026, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which shall send notification of such filing to all parties of record.

/s/ M. Caroline Wood
M. Caroline Wood

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**

| | |
|---|---|
| DONALD B. HODGES, JOYCE R. KENDRICK, Individually and on behalf of the Washington Regional 401(k) Plan, and on behalf of all similarly situated participants and beneficiaries of the plan,<br><br>Plaintiffs,<br><br>v.<br><br>WASHINGTON REGIONAL MEDICAL SYSTEM and the PENSION COMMITTEE,<br><br>Defendants. | Case No.: 5:26-cv-05070-TLB |

**DECLARATION OF WILLIAM J. DELANY IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' CLASS ACTION COMPLAINT**

Pursuant to section 1746 of Title 28 of the United States Code, I, William J. Delany, declare under penalty of perjury that the following is true and correct to the best of my own personal knowledge, recollection and belief.

1.      I am an attorney and principal at the law firm Groom Law Group, Chartered, and counsel for Defendants Washington Regional Medical System and the Pension Committee (collectively, "Defendants") in the above-captioned matter.

2.      I am over twenty-one years of age and make this declaration from personal knowledge based on information reviewed and/or referenced herein.

3.      I submit this declaration in support of Defendants' Motion to Dismiss Plaintiffs' Class Action Complaint.

4.      Attached hereto as **Appendix E** is a chart comparing target date funds ("TDFs") offered by BlackRock with TDFs offered by American Funds, Vanguard, and T. Rowe Price for the two-year period of 2018 to 2019 using the same metrics as the Complaint (Dkt. 2) ¶ 67 (Figure 3), based on the data found in Appendix A to the Complaint (Dkt. 2-1) at pp. 2, 4, 6, 8, 10, 12, 14-15, 17, 19, 21, 23, 25, 27-28, 30, 32, 34, 36, 38, 40-41, 43, 45, 47, 49, 51, 53.

5.      Attached hereto as **Exhibit 7** are excerpts of American Century's website, the first source cited in footnote 11 of the Complaint.

6.      Attached hereto as **Exhibit 8** are excerpts of U.S. Department of Labor, *A Look at 401(k) Fee Plans* (Sept. 2019), cited on page 27 of Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss (Dkt. 18).


Executed on July 6, 2026                                                         */s/ William J. Delany*
                                                                                              William J. Delany

# Appendix E

**BlackRock LifePath Index (Trust T) vs. Remaining Comparator TDFs**

**MPT Complaint Metrics — Trailing 3-Year and 5-Year Periods**

Periods Ending December 31, 2018 and December 31, 2019, Combined

As alleged in Appendix A to the Complaint (Dkt. 2-1)

| | All Comparators, Combined | | American Funds (MF R6) | T. Rowe Price Ret (CIT Trust A) | Vanguard Tgt Ret (CIT Trust II) |
|---|---|---|---|---|---|
| **Total Worse, By Statistic** | | | | | |
| Trailing Return 3Y | 39 of 42 | (92.9%) | 14 of 14 | 14 of 14 | 11 of 14 |
| Trailing Return 5Y | 38 of 38 | (100.0%) | 12 of 12 | 13 of 13 | 13 of 13 |
| Sharpe Ratio 3Y | 41 of 42 | (97.6%) | 14 of 14 | 14 of 14 | 13 of 14 |
| Sharpe Ratio 5Y | 38 of 38 | (100.0%) | 12 of 12 | 13 of 13 | 13 of 13 |
| Information Ratio 3Y | 39 of 42 | (92.9%) | 14 of 14 | 14 of 14 | 11 of 14 |
| Information Ratio 5Y | 38 of 38 | (100.0%) | 12 of 12 | 13 of 13 | 13 of 13 |
| Alpha 3Y | 41 of 42 | (97.6%) | 14 of 14 | 14 of 14 | 13 of 14 |
| Alpha 5Y | 38 of 38 | (100.0%) | 12 of 12 | 13 of 13 | 13 of 13 |
| Sortino Ratio 3Y | 40 of 42 | (95.2%) | 14 of 14 | 14 of 14 | 12 of 14 |
| Sortino Ratio 5Y | 38 of 38 | (100.0%) | 12 of 12 | 13 of 13 | 13 of 13 |
| Batting Average 3Y | 19 of 42 | (45.2%) | 7 of 14 | 7 of 14 | 5 of 14 |
| Batting Average 5Y | 34 of 38 | (89.5%) | 12 of 12 | 13 of 13 | 9 of 13 |
| Turnover Ratio 1Y | 27 of 34 | (79.4%) | 8 of 8 | 10 of 14 | 9 of 12 |
| **Total Worse, All Statistics** | **470 of 514** | | **157 of 164** | **165 of 176** | **148 of 174** |
| **% Worse** | **91.4%** | | **95.7%** | **93.8%** | **85.1%** |

# Exhibit 7

The Wayback Machine - https://www.americancentury.com/advisors/client-conversations/target-date-solutions/one-choice-tar…

Visit Institutional Site  |  Support  |  Open an Account  |  Register for Access

**American Century Investments®**

**Invest**　　**Plan**　　**About Us**　　**For Advisors**　　　🔍　　Log In

# One Choice® Target Date Portfolios

## An Intentionally Moderate Approach

Menu  ⌄

Target-date portfolios were never meant to be a high-stakes gamble for investors.

The original intent of target-date portfolios was to offer retirement savers an investment option that focused on growing wealth over time while becoming more conservative as retirement neared. But, over the most recent decade, an increasing number of target-date providers have moved to a more aggressive equity positioning, justified by trends extrapolated from an unprecedented bull market.[1]

We believe this doubling down on growth in the primary retirement solution for most defined contribution plans disregards the inherent risk that market conditions will, can and do turn negative—which may result in losses for participants that they may have a hard time recovering from.

**We have stayed true to target date's original purpose with our design—an intentionally moderate approach.**

Why? It's math. When you aim for the highest growth, you also introduce a higher risk of loss. The more a portfolio loses, the more it must gain to get back to even.

The target date in a fund's name is the approximate year when investors plan to retire or start withdrawing their money. The principal value of the investment is not guaranteed at any time, including at the target date. Each target-date fund seeks the highest total return consistent with its proprietary asset mix. Over time, the asset mix and weightings are adjusted to be more conservative. In general, as the target year approaches, the portfolio's allocation becomes more conservative by decreasing the allocation to stocks and increasing the allocation to bonds.

[1] Source: S&P Dow Jones Indices LLC, Morningstar. Data as of May 31, 2015 and as of Dec. 29, 2023.

Our more moderate, risk-balanced approach may generate a smoother path of investment returns which we expect could lead to better outcomes over time for investors.



**Pursues a smoother investor journey**



**Focuses on providing better**

**Aligns with a more risk-balanced**

**through a flatter glide path.**

Learn More    >

**outcomes for tomorrow by managing across the entire market cycle.**

Learn More    >

**approach.**

Learn More    >

# Pursues a Smoother Path of Performance

## Our Balance of Risks Framework



Tail risk is the risk of a tail event. Please see our glossary for definitions of tail event, sequence-of-returns risk, and longevity risk. For more information on longevity risk, view our article.

Constructing a glide path is not as simple as aiming for the highest growth. That's because doing so potentially ignores the other risks in long-term investing. And it creates a wider range of potential outcomes that could result in a larger probability of failure in retirement.

In contrast, American Century Investments' glide path design seeks to balance the multiple risks participants face when investing for

retirement. These risks must be managed as they change in relative importance during the target-date life cycle and through various market environments.

The result is a more moderate, flatter glide path, which aims to keep more participants on course throughout their journey to and through retirement.

## Our Flatter Glide Path Balances Multiple Risks



Source: American Century Investments®.
The industry median glide path represents the 50th percentile equity allocation among funds in the Morningstar Target-Date universe. The industry max and min represent the equity allocation among funds in the Morningstar Target-Date universe.

**Moderate equity allocations in the accumulation years.**

Historically, index returns of an 85% stock/15% bond portfolio earned 95% of the gains of an all-stock portfolio with only 86% of the risk.[2]

**Flatter glide path during the "transition risk zone."**

The 15-year period before retirement is arguably the most critical time for retirement investing. That's because account balances are highest

**Optimal equity allocation at retirement.**

We believe a 45% equity allocation at retirement balances growth risk versus market risk.

near retirement, so a downturn here is particularly painful.

² Source: FactSet. Based on annualized returns and standard deviation of a portfolio consisting of 85% Russell 1000 Index/15% Bloomberg U.S. Aggregate Bond Index. The all-stock portfolio is represented by the Russell 1000 Index. Annualized data from 12/31/1983 to 3/31/2024

## The Importance of the Transition Risk Zone

Glide path design involves more than just the level of equity allocation—the rate at which equity decreases is important too. We know that a shock—an unexpected job loss or significant market event—could jeopardize savings plans just when participants have the most to lose and the least amount of time to recover.

In contrast to our flatter, moderate approach, steep glide path descents in the transition risk zone have a higher probability of locking in losses for participants near retirement.

### Participants Ages 50+ Typically Have the Most to Lose



**68%**

of final retirement balances are typically accumulated between the ages of 50–65.[3]

**Every 8 years,**

the stock market has declined 20% or more.[4]

**50% or more**

Of people retire earlier than expected.[5]

³ Source: American Century Investments.
⁴ Source: FactSet, S&P 500 Index Returns. Average returns 1/1/1929 - 12/31/2023.
⁵ Source: 2023 Transamerica Center for Retirement Studies "Life in Retirement: Pre-Retiree Expectations and Retiree Realities."

Growth of a hypothetical participant's retirement savings from age 25 to 65. Assumptions: starting salary $45,000, growing at 2% per annum. Contribution rate fixed at 10% of salary each year. Annual portfolio return of 6.5% per year.

## The Unforgiving Math of Recovery

Participants close to or in retirement may not have enough time to recover from a market shock. This hypothetical example illustrates how larger losses can pose a significant drag on longer-term performance. That's because portfolios must generate exponentially higher returns just to recover from the losses.

| If you're down this much | You'll need to gain this to break even | Number of years needed to break even at the following rates of return | | | | |
|---|---|---|---|---|---|---|
| | | 2% | 4% | 6% | 8% | 10% |
| -10% | 11.1% | 5.3 | 2.7 | 1.8 | 1.4 | 1.1 |
| -20% | 25% | 11.3 | 5.7 | 3.8 | 2.9 | 2.3 |
| -30% | 42.9% | 18.0 | 9.1 | 6.1 | 4.6 | 3.7 |
| -40% | 66.7% | 25.8 | 13.0 | 8.8 | 6.6 | 5.4 |
| -50% | 100% | 35.0 | 17.7 | 11.9 | 9.0 | 7.3 |

Hypothetical illustration. Results not intended to represent any actual investment strategy.

# Focuses on Providing Better Outcomes for Tomorrow

When the goal is to provide more retirees with retirement savings to last a lifetime, short-term performance is not an accurate indicator of a portfolio's long-term outcome. Rather, it's also about keeping participants on course through the market's ups and downs.

We believe that risk management not only helps participants stay confidently invested in their portfolio, but also is a key factor in overall asset accumulation.

## One Choice Stands Out™ Over a Full Market Cycle

One Choice Target Date Portfolios' more moderate approach historically has performed as designed over a full market cycle, which is defined as a timespan including both a bull and a bear market.

Again, it's math—by losing less in down markets, such as the Financial Crisis, and pursuing responsible growth in up markets, the portfolio has provided better overall asset accumulation than the more aggressive strategy shown below.



**Total Gain in Wealth**
**(11/1/2007 - 6/30/2024)**

| | American Century One Choice® In Retirement | Aggressive Competitor |
|---|---|---|
| Beginning Wealth 11/1/2007 | $100,000 | $100,000 |
| Global Financial Crisis Loss 11/1/2007 - 2/28/2009 | ($28,813) | ($39,269) |
| Bull Market Gains Since 3/1/2009 | $149,555 | $157,534 |
| **Total Wealth 11/1/2007 - 6/30/2024** | **$220,742** | **$218,265** |

One Choice is represented by the American Century One Choice In Retirement I Fund. One Choice 2015 merged with One Choice In Retirement effective 3/27/2015. The Aggressive Target Date Fund (TDF) is represented by American Funds 2015 Trgt Date Retire R5. Data presented reflects past performance. Past performance is no guarantee of future results.

The analysis assumes a $100,000 starting balance and tracks the performance of the two products from the beginning of the Financial Crisis to the most recent quarter-end. The hypothetical situations shown contain assumptions that are intended for illustrative purposes only and are not representative of the performance of any security. There is no assurance similar results can be achieved, and this information should not be relied upon as a specific recommendation to buy or sell securities. See additional disclosures at the end of this document.

As you can see in this example, our risk-aware approach resulted in better participant outcomes than an aggressive target date over a full market cycle.

**2% more gains in wealth with 8% less volatility over a full market cycle.**
11/1/2007 - 6/30/2024

### 8.66% Standard Deviation vs. 9.41% for an Aggressive Target Date Fund

11/1/2007 - 6/30/2024
Standard deviation is a measure of risk or volatility. Because the One Choice Target Date Portfolio has a lower standard deviation, it experienced less volatility during this period than the agressive competitor.

### .44 Risk-Adjusted Return (Sharpe Ratio) vs. .39 for an Aggressive Target Date Fund

11/1/2007 – 6/30/2024
Risk-adjusted returns, such as Sharpe ratio, account for the amount of risk taken to achieve the returns. Because the One Choice Target Date Portfolio has a higher Sharpe ratio, it means that for every unit of risk taken, it gained a higher return when compared to the aggressive competitor.

### 51.39% Downside Capture vs. 55.27% for an Aggressive Target Date Fund

11/1/2007 - 6/30/2024
Downside capture is a measurement of an investment's relative performance versus its benchmark in down markets. Down markets are defined as periods where the S&P 500 returns are negative. Because

the One Choice Target Date Portfolio has a lower downside capture ratio, it means that it experienced less loss versus the benchmark than the aggressive competitor over the same period.

Source: American Century Investments, FactSet and Morningstar. Data as of 6/30/2024. One Choice is Represented by One Choice In Retirement Portfolio, Class I. One Choice 2015 merged with One Choice In Retirement effective 3/27/2015. Data presented reflects past performance. Past performance is no guarantee of future results. The Aggressive Target Date Fund (TDF) is represented by American Funds 2015 Trgt Date Retire R5.

## Aligned with Plans Seeking a Risk-Balanced Approach

Selecting the right target date strategy is a critical decision for plan sponsors and their consultants. Plan populations differ in many ways, including savings levels, demographics and risk appetites.

Given the ups and downs of financial markets and a natural aversion to losses, it's not surprising that two-thirds of plan sponsors and participants prefer an approach that prioritizes protection from loss over growth potential.

## Determining Fit—Prudence Looks for Process

The DOL has given fiduciaries guidance on the selection and monitoring of a target-date strategy to meet safe harbor status and reduce the potential for litigation. The department's Tips for ERISA Plan Fiduciaries ⬀ clearly states the importance of documentation that the QDIA selection aligns with a plan's objectives and demographics.

Regardless of the product that you choose, case law shows the courts look for documentation that a prudent process was followed and decisions were made with the best interest of plan participants in mind.

## 2 out of 3

plan sponsors and participants prefer a target date approach that **prioritizes protection from losses** over growth potential.

American Century Greenwald Retirement Survey 2022.

## Staying True to Fit is the Right Strategy for Clients

Target-date selection should be focused on the "right fit" for the most participants, which means evaluating all types of target-date approaches. One Choice Target Date Portfolios' approach may meet the needs of those seeking a more moderate solution.

## Hear Straight Talk from the Investment Team

## Weekly Updates from Rich Weiss, CIO

Every Monday, American Century Investments hosts a call with CIO Rich Weiss, where he addresses the latest news—offering his insights and color commentary on the economy, markets and portfolio positioning.

**Click here to hear how American Century Investments' Multi-Asset portfolios are managing risk in today's markets.**



# Need Help Finding the Right Target-Date Strategy?

Find out if a moderate or more aggressive target-date strategy is better suited for your plan.



**Target-Date Blueprint Tool**

Target-Date Blueprint is an online tool designed to help you apply a prudent process to identify the right QDIA solution for each plan. Narrow the target-date universe to focus on only those with appropriate investment profiles aligned.

- **Learn more about Target-Date Blueprint**
- **View sample report** 📄



**Other Resources**

- **Department of Labor Tips** ↗
- **View Our Fiduciary Responsibility Resources**
- **View our additional QDIA options**
- **One Choice® Target Date Portfolios Brochure (For Financial Professionals Only)** 📄

# Exhibit 9

# A LOOK AT 401(K) PLAN FEES



This publication has been developed by the U.S. Department of Labor, Employee Benefits Security Administration (EBSA).

To view this and other EBSA publications, visit the agency's **Website.**

To order publications or speak with a benefits advisor, contact EBSA **electronically.**

Or call toll free: **1-866-444-3272**

This material will be made available in alternate format to persons with disabilities upon request:
Voice phone: **(202) 693-8664**
TTY: **(202) 501-3911**

This booklet constitutes a small entity compliance guide for purposes of the Small Business Regulatory Enforcement Fairness Act of 1996.

# Introduction



**More and more employees are investing in their futures through 401(k) plans. Employees who participate in 401(k) plans assume responsibility for their retirement income by contributing part of their salary and, in many instances, by directing their own investments.**

If you direct your investments, you will need to consider the investment objectives, the risk and return characteristics, and the performance over time of each investment option your plan offers in order to make sound investment decisions. Fees and expenses are one of the factors that will affect your investment returns and impact your retirement income.

This booklet answers some common questions about the fees and expenses that your 401(k) plan may pay. It highlights the most common fees and encourages you, as a 401(k) plan participant, to:

- Make informed investment decisions;

- Consider fees as one of several factors in your decision making;

- Compare all services received with the total cost; and

- Realize that cheaper is not necessarily better.

Keep in mind, however, that this booklet is a simplified explanation of some common 401(k) fees. It is not a legal interpretation of the nation's major retirement benefits protection law, the Employee Retirement Income Security Act (ERISA), or other laws, nor is this information intended to be investment advice.

## Why consider fees?

In a 401(k) plan, your account balance will determine the amount of retirement income you will receive from the plan. While contributions to your account and the earnings on your investments will increase your retirement income, fees and expenses paid by your plan may substantially reduce the growth in your account which will reduce your retirement income. The following example demonstrates how fees and expenses can impact your account.

Assume that you are an employee with 35 years until retirement and a current 401(k) account balance of $25,000. If returns on investments in your account over the next 35 years average 7 percent and fees and expenses reduce your average returns by 0.5 percent, your account balance will grow to $227,000 at retirement, even if there are no further contributions to your account. If fees and expenses are 1.5 percent, however, your account balance will grow to only $163,000. The 1 percent difference in fees and expenses would reduce your account balance at retirement by 28 percent.

In recent years, there has been a dramatic increase in the number of investment options typically offered under 401(k) plans as well as the level and types of services provided to participants. These changes give employees who direct their 401(k) investments greater opportunity than ever before to affect their retirement savings. As a participant, you may welcome the variety of investment options and the additional services, but you may not be aware of their cost. As shown above, the cumulative effect of the fees and expenses on your retirement savings can be substantial.

You should know that your employer also must consider the fees and expenses paid by your plan. ERISA requires employers to follow certain rules in managing 401(k) plans. Employers are held to a high standard of care and diligence and must discharge their duties solely in the interest of the plan participants and their beneficiaries. Among other things, this means that employers must:

- Establish a prudent process for selecting investment options and service providers;

- Ensure that fees paid to service providers and other plan expenses are reasonable in light of the level and quality of services provided;

- Select prudent and adequately diversified investment options;

- Disclose plan, investment, and fee information to participants to make informed decisions about their investment options under the plan; and

- Monitor investment options and service providers once selected to make sure they continue to be appropriate choices.

## What are 401(k) plan fees and who pays for them?

If you want to know how fees affect your retirement savings, you need to know about the different types of fees and expenses and the different ways in which they are charged.

2

September 2019



**EMPLOYEE BENEFITS SECURITY ADMINISTRATION**
UNITED STATES DEPARTMENT OF LABOR